**FUJITSU LIMITED, Plaintiff–Appellee,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant–Appellant.**

**Docket No. 00–7343.**

United States Court of Appeals, Second Circuit.

Argued Nov. 8, 2000.

Decided April 20, 2001.

Warren Dean, Federal Express Corp., Memphis, TN, (R. Jeffery Kelsey on brief) and Patrick J. Keating, Kaplan, Begy & Von Ohlen, Chicago, IL, (Nicholas E. Pantelopoulos, Biedermann, Hoenig, Massamillo & Ruff on brief), for Appellant.

William R. Connor, III, Bingham, Englar, Jones & Houston, New York, NY, (John MacCrate III on brief), for Appellee.

Before STRAUB, SOTOMAYOR, Circuit Judges, and SPATT, District Judge.[1]

SPATT, District Judge:

This case primarily concerns interpretation of the Warsaw Convention treaty governing the liability of international cargo shippers for damage to returned goods while in their possession. We find that the shipment at issue was not a return as defined by Article 12 of the Warsaw Convention and that the carrier's shipment of the goods back to the departure destination at the consignee's direction involved a second acceptance under Article 9, requiring the carrier to create a complete and correct air waybill in order to avail itself of the Convention's limited liability provisions. Because the carrier failed to furnish a complete and correct air waybill upon acceptance of the goods, we affirm the district court's grant of partial summary judgment in favor of the Plaintiff on the carrier's defense of limited liability. We also reject the carrier's argument that the entry into force of the Hague Protocol, which amended the Warsaw Convention, during the pendency of this case (but after the events giving rise to this case) precludes the application of the unamended Warsaw Convention. We find that the district court correctly applied the unamended provisions of the Warsaw Convention. Finally, we affirm the district court's assessment of damages and determination that spoliation sanctions were not warranted.

## BACKGROUND

On May 30, 1996, Plaintiff–Appellee Fujitsu Limited ("Fujitsu") shipped a container of silicon wafers from Narita, Japan to Ross Technologies, Inc. ("Ross") in Austin, Texas, using Defendant–Appellant Federal Express ("FedEx") as the cargo carrier. Accompanying the container was an air waybill—a document serving as a bill of lading for goods transported by air, BLACK'S LAW DICTIONARY 70 (6th ed.1990)—designated as "AWB3691," specifying the consignor and consignee, weight, contents, destination, and route of the container.

On May 31, 1996, the container arrived in Austin and was placed in a bonded cargo cage to await clearance through customs by the Customs Agent for Ross. FedEx does not release goods to their consignees until the goods actually have cleared customs and all import and customs duties have been paid. In this case, Ross' Customs Agent faxed a notification to FedEx that Ross was rejecting the shipment. Pursuant to FedEx's procedures, it contacted Fujitsu and Ross to determine what should be done with the cargo. FedEx policy provided that cargo refused by the consignee would not be moved without *written* instructions and a guarantee of payment.

According to a June 3, 1996 comment in the FedEx computer tracking system concerning a telephone call, Fujitsu orally instructed FedEx to return the goods to Japan. However, a separate document in the record, on Ross letterhead and dated June 4, 1996, indicates that Ross issued written instructions to FedEx to return the goods to Fujitsu in Japan and informed FedEx that Ross would incur all shipping charges. On July 27, 1996, after the return shipment was completed, FedEx sent an invoice billing Ross $493.00 for the return of the shipment to Japan. The trial court found that "[Ross] decided not to accept the merchandise, and en-

---

1. The Honorable Arthur D. Spatt of the United States District Court, Eastern District of New York, sitting by designation.

gaged Federal Express to return the merchandise to the consignor in Tokyo at the consignee's expense."

FedEx proceeded to prepare the goods for shipment back by re-labeling and moving the cargo from the customs cage to an outbound staging area. The goods were flown from Austin to the main FedEx hub in Memphis. No air waybill was created in Austin, but in Memphis, FedEx created a new air waybill, designated AWB 3010, listing Ross as the shipper and indicating that the goods were to be shipped from Austin to Narita. AWB 3010 was not completely filled out, but did specifically contain a legend stating "RETURN OF [AWB 3691]" typed across the middle right-hand side of the air waybill form. Fujitsu contends that this legend appeared only on one copy of AWB 3010, not all of them. FedEx asserts that it issued a new air waybill only to accommodate the needs of its computerized package tracking system, not because a new shipping contract was created for the return shipment.

FedEx air waybill numbers also serve as package tracking numbers, which appear on the air waybills in both numerical and barcode form. That tracking number is scanned into the FedEx computer system at various points during transit, in order to track the status of particular shipments. However, when a shipment is returned by FedEx, the computer system requires that a new tracking number (and, therefore, a new air waybill number) be issued. The computer system does not permit the use of the original air waybill number to track the return of the cargo to the original shipper, and as a result of this technological requirement, FedEx's standard policies for return of international shipments require that new air waybills be issued.

The goods apparently left Austin in good condition, but sat in Memphis for a week before being shipped to Japan. On June 24, 1996, the shipment arrived in Japan. At that time, Fujitsu observed that the outer container was broken and covered with an oily substance which had permeated into some of the interior boxes. Fujitsu opened one of the interior boxes and discovered that the oily substance was also on the exterior of the sealed aluminum bags containing the wafers. Fujitsu did not open any of the bags to determine whether the oily substance had penetrated any of the bags.

Fujitsu reported the damage to FedEx immediately. FedEx eventually acknowledged that the damage occurred to the container while in its possession. At some point in July 1996, upon instructions from its insurance carrier, Fujitsu disposed of the container and wafers. FedEx had not requested an opportunity to inspect the wafers prior to that time.

Fujitsu then brought this action against FedEx grounded in breach of contract and negligence. FedEx raised the defense that, under the Warsaw Convention treaty governing international cargo shipments, it carried the cargo with a proper air waybill and was thus entitled to a limitation on its liability to $9.07 per pound, or a total of about $1,200 for the entire shipment. On November 30, 1999, Judge Hellerstein granted partial summary judgment to Fujitsu, finding that air waybill AWB3010 did not comply with the requirements of the treaty, and that the shipment from Austin to Japan could not be considered to be covered by AWB3691, the initial air waybill. A bench trial on damages was held on February 22 and 23, 2000, and at the close of the trial, Judge Hellerstein found FedEx liable to Fujitsu for damages in the amount of $726,640.

FedEx appeals, claiming (i) that the trial court erred in finding that the return shipment was not covered by the waybill of the originating shipment; (ii) that the court

improperly found that an amendment to the Warsaw Convention known as the Hague Protocol was inapplicable; (iii) that the court's findings regarding damages were incorrect; and (iv) that the court erred in denying FedEx's request for a finding of spoliation relating to Fujitsu's destruction of the container and wafers.

## DISCUSSION

■ This Court reviews the District Court's grant of summary judgment *de novo*. While all factual ambiguities must be resolved in favor of the nonmoving party, "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v.. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

### A. The Warsaw Convention's limitation of liability

International transportation of persons, baggage, and goods by air are governed by the series of laws, treaties, and individual contracts collectively referred to as the Warsaw Convention "system," deriving that name from the international agreement commonly referred to as the "Warsaw Convention." Convention for the Unification of Certain Rules relating to International Transportation by Air,

*opened for signature* Oct. 12, 1929, 49 Stat. 3000 (1934), 137 L.N.T.S. 11, *reprinted in note following* 49 U.S.C.A. § 40105 ("Original Warsaw Convention"); *see El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 160, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); *Chubb & Son, Inc. v. Asiana Airlines,* 214 F.3d 301, 306 (2d Cir.2000), *petition for cert. filed,* 69 U.S.L.W. 3335 (U.S. Nov. 2, 2000) (No. 00–720). The Warsaw Convention sets forth uniform rules of liability for loss, damage, or delay of international shipments by air, and embodies a tradeoff between the interests of carriers and shippers. Among its provisions is the rule that cargo carriers are entitled to a limitation of liability based on the weight of the shipment, presently established by the Government at $9.07 per pound. *See Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 255, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); Warsaw Convention art. 22.

The carrier's right to limited liability revolves around the document called an "air waybill," which contains details including the origin, itinerary, and destination of the cargo, and the weight, dimensions, and content of the containers. Specifically, Article 8 of the treaty states that

The air waybill shall contain the following particulars:

(a) the place and date of its execution;

(b) the place of departure and of destination;

(c) the agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity . . .;

(d) the name and address of the consignor;

(e) the name and address of the first carrier;

(f) the name and address of the consignee . . .;

(g) the nature of the goods;

(h) the number of packages, the method of packing, and the particular marks or numbers upon them;

(i) the weight, the quantity, the volume, or dimensions of the goods;

. . .

(q) A statement that the transportation is subject to the rules relating to liability established by this convention.

Warsaw Convention art. 8(a)–8(q). According to Article 9 of the treaty, "[i]f the carrier accepts goods without an air waybill having been made out, or if the air waybill does not contain all the particulars set out in article 8(a) to (i) . . . the carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability."

Due to the significant benefit that limited liability confers upon cargo carriers, the courts have generally required carriers to comply strictly with the terms of Article 8, and the omission of any required item from the air waybill, with exceptions not applicable here, will result in the loss of limited liability regardless of the commercial significance of the omission. *See Intercargo Ins. Co. v. China Airlines, Ltd.,* 208 F.3d 64, 67 (2d Cir.2000) (*citing Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1033–34 (2d Cir.1996)); *Tai Ping Ins. Co. v. Northwest Airlines, Inc.,* 94 F.3d 29, 31 (2d Cir.1996).

It is undisputed that AWB 3691, the first waybill for the shipment from Tokyo to Austin, contained all of the information for that shipment required by Article 8. It is also undisputed that the goods were shipped from Austin to Memphis without the issuance of a new air waybill, and that the air waybill created in Memphis for the return flight to Tokyo did not include the "agreed stopping places" for that return shipment as required by Article 8(c).

■ FedEx argues that the shipment from Austin to Japan was a return shipment pursuant to Article 12 of the Warsaw Convention, rather than a shipment pursuant to a new contract of carriage. Thus, FedEx contends it was not required to issue an amended or second air waybill for the return, but rather, could rely on AWB 3691, the air waybill issued for the shipment from Japan to Austin. Article 12 grants the consignor of the shipment the right to "dispose of the goods by withdrawing them at the airport of departure or destination, or by stopping them in the course of the journey on any landing . . . or by requiring them to be returned to the airport of departure." Article 12, however, does not address whether the issuance of a second or amended waybill is required when a consignor orders the carrier to return the goods to the airport of departure. We need not resolve that question today, because, as discussed below, FedEx's shipment of the wafers from Austin to Japan was not a return of goods as defined by Article 12 but rather was a separate shipment based on a new contract of carriage.

Article 12 addresses the right of the consignor to have a carrier return the goods. Article 12 is inapplicable here because it was the *consignee,* Ross, not the consignor, Fujitsu, who ordered FedEx to return the goods to the airport of departure. FedEx Service Agent Cherri Field testified in a deposition that once goods in its possession were rejected, FedEx would not move the goods anywhere without *written* instructions and a guarantee of payment for the return shipping costs. Although FedEx asserts that instructions to return the shipment came from Fujitsu, the record indicates that FedEx treated the return shipment as having originated from Ross. After reviewing FedEx's computer records, Field testified at her deposi-

tion that authorization to return the goods came from Ross, not Fujitsu. When FedEx created the second waybill, AWB 3010, it listed Ross, not Fujitsu, as "Shipper." An Air Cargo Manifest produced by FedEx dated June 18, 1996 also appears to list Ross as the shipper and Fujitsu as the consignee. Further, following the completion of the shipment to Japan, FedEx invoiced Ross, not Fujitsu, for payment of the return shipping charges and payment was made by Ross. Under these circumstances, we find that the trial court correctly determined that the instruction to return the goods to Japan was given by Ross, not Fujitsu.

Because it was Ross, not Fujitsu, that instructed FedEx to return the goods, we find that the shipment of the goods from Austin to Japan was not a return as defined by Article 12, but rather, was a shipment based on a new contract of carriage. Under the provisions of Articles 8 and 9, if FedEx wanted to avail itself of the Warsaw Convention's limited liability provisions for this second, separate shipment, it was required to prepare a complete air waybill when it accepted the goods for shipment from Austin to Japan. As previously discussed, FedEx did not create a second air waybill in Austin, and the air waybill it created en route was incomplete.

Our determination that FedEx was required to issue a complete and correct air waybill in order to gain the Convention's liability limitation for the shipment from Austin to Japan is not affected by FedEx's contention that pursuant to Article 9, limited liability is either gained or lost by the carrier at the time it initially "accepts" the goods for shipment and that there was only one acceptance of the goods in this case. Specifically, FedEx argues that at the time it accepted the goods in Japan for shipment to Austin, it secured the valid

waybill AWB 3691, and thus, obtained the protection of the Convention for limited liability with regard to the shipment at issue. FedEx claims that a second acceptance did not occur in Austin because the shipment never left FedEx's custody and control, and thus, could not have been accepted by it from Ross in Austin.

The Warsaw Convention does not define "accepts," and this Court has uncovered no cases interpreting that term in the context it is used in Article 9. While the notion of "acceptance" does appear to contemplate a receiving of an item by the person making the acceptance, BLACK'S LAW DICTIONARY 12 (6th ed.1990), nothing in that definition warrants a conclusion that transfer must involve a physical delivery of the property. Here, FedEx entered into a new contract of carriage with Ross on or about June 4, 1996 to ship the goods from Austin back to Narita. In doing so, Ross implicitly assumed authority to direct and control the movement of the goods, and FedEx appears to have accepted the authority of Ross to do so. Under these circumstances, requiring Ross to physically receive and re-present the goods to FedEx to complete the transaction seems needlessly formalistic. By that logic, upon receiving notice that an inbound shipment was arriving, a consignee wishing to redirect the shipment to a third-party would have to travel to the receiving airport to accept the shipment and physically re-tender it to the carrier before the carrier could "accept" it for shipment to the third-party.

Accordingly, we find that the record supports the determination by the trial court that a new contract of carriage was created in Austin and, by extension, a constructive acceptance took place there for purposes of Article 9. Because FedEx failed to obtain a proper air waybill in Austin for the return shipment by Ross, it

is not entitled to the limited liability protection of the Warsaw Convention, and the decision of the trial court granting partial summary judgment to Fujitsu on FedEx's defense of limited liability is affirmed.

## B. The Hague Protocol

FedEx also contends that this case is not governed by the Original Warsaw Convention, but rather by the Warsaw Convention as modified by the international agreement referred to as the "Hague Protocol." *See* Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371 ("Hague Protocol"). The Hague Protocol, which eliminates some of the formalities required under Articles 8 and 9 of the Original Warsaw Convention, was ratified by Japan on November 8, 1967, but did not enter into force for the United States until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999. *See* Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929 as amended by the Protocol done at the Hague on 28 September 1955, Sept. 25, 1975, Message Transmitting Two Related Protocols, *reprinted in* S. Exec. Rep. No. 105–20, art. XVII(2); *Chubb*, 214 F.3d at 307 n. 4.

As amended by the Hague Protocol, Article 9 deprives carriers of the Convention's limited liability protections only if "cargo is loaded on board the aircraft without an air waybill having been made out" or if "the air waybill does not include the notice required by Article 8, paragraph (c)." The revised version of Article 8(c) requires the carrier to give the consignor notice

to the effect that, if the carriage involves an ultimate destination or stop in a country other than the country of departure, the Warsaw Convention may be applicable and that the Convention governs and in most cases limits the liability of carriers in respect of loss of or damage to cargo.

Warsaw Convention, art. 8(c) (as amended by the Hague Protocol). FedEx argues that the adoption of the Hague Protocol prior to the decision of the trial court in this case effectively abated the operation of the provisions of the Original Warsaw Convention, or that, in the alternative, it would be able to avail itself of the liability limitations of the Convention under the terms as amended by the Hague Protocol.

In response, Fujitsu argues that applying the Hague Protocol to facts that took place almost two years before that agreement's entry into force for the United States would conflict with our recent conclusion in *Chubb* that the Hague Protocol not be given retroactive effect. *See Chubb*, 214 F.3d at 307 n. 4 ("Because the actions giving rise to this suit occurred in 1995, Montreal Protocol No. 4 does not affect this case.") (*citing* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 322(1) (1987)).

■ However, FedEx's principal argument is not that the Hague Protocol should be given *retroactive* effect, but rather that the Original Warsaw Convention cannot *prospectively* be enforced following the Hague Protocol's entry into force. This theory is advanced under the common law doctrine of abatement, in which a court is without power to enforce inchoate rights or imperfect obligations under statutes that have been repealed or amended, but not explicitly saved or preserved at the time of repeal or amendment. *See Hertz v. Woodman*, 218 U.S. 205, 217–18, 30 S.Ct. 621, 54 L.Ed. 1001 (1910); *United States v.*

*Mechem,* 509 F.2d 1193, 1194–95 & n. 3 (10th Cir.1975); *see also* 1A SUTHERLAND STAT. CONST. § 23.33, at 424–25 (Norman J. Singer ed., 5th ed. 1993) ("Under common-law principles, all rights, liabilities, penalties, forfeitures and offences which are of purely statutory derivation and unknown to the common law are eliminated by the repeal of the statute which granted them, irrespective of the time of their accrual.").

In order to avoid the potentially disruptive implications of this common law rule, Congress has enacted a general savings statute, 1 U.S.C. § 109, which provides that

> [t]he repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109. This provision operates to preserve both civil and criminal statutory liabilities. *See Hertz,* 218 U.S. at 217–18, 30 S.Ct. 621. Whether the earlier statute has been amended or repealed outright is of no consequence; the general savings statute applies in either instance. *See Mechem,* 509 F.2d at 1194–95 & n. 3. Therefore, if the Hague Protocol and Montreal Protocol No. 4 were statutes rather than treaties, the provisions of the Original Warsaw Convention would remain applicable under the general savings statute in 1 U.S.C. § 109 to conduct that took place prior to the Hague Protocol's entry into force for the United States in March 1999. This is so notwithstanding the fact that neither the Hague Protocol nor Montreal Protocol No. 4 contains its own savings provision.

However, FedEx maintains that *treaties* do no fall within the ambit of 1 U.S.C. § 109, arguing that as a statutory exception to a traditional common law rule, the general savings clause must be interpreted narrowly so as not to apply to "treaties" but only to "statutes." *See e.g. Rodgers v. United States,* 158 F.2d 835, 836–37 (6th Cir.1947) (since predecessor to 1 U.S.C. § 109 "prescrib[es] a rule differing from that of the common law," it cannot be interpreted to include repealed regulations, but "must be strictly construed and limited to repealed statutes"). FedEx argues that because courts cannot enforce any statutory or treaty remedy that is no longer in effect and has not been saved, the remedy under Article 9 of the Original Warsaw Convention, which provides for unlimited liability for clerical omissions in air waybills, was abated and extinguished upon entry into force of the Hague Protocol and Montreal Protocol No. 4 (and the concurrent repeal of the Original Warsaw Convention) on March 4, 1999.

While we resolved the retroactivity of the Hague Protocol in *Chubb,* this case presents a distinct issue of first impression: whether the rights and liabilities of the Original Warsaw Convention were abated and extinguished by entry into force of the Hague Protocol. As FedEx correctly argues, the answer to that question does not *logically* depend upon whether the Hague Protocol is to be given retroactive effect. Indeed, while FedEx does urge us to overrule our recent holding in *Chubb* and to give limited retroactive effect to the Hague Protocol to fill the gap it perceives to have been left by the repeal of the Original Warsaw Convention, it would be just as possible for us to fill that gap with a rule derived from the law that governed before the Warsaw Convention. *Cf. Ruston Gas Turbines, Inc. v. Pan American World Airways,* 757 F.2d 29, 30

(2d Cir.1985) (holding that "[d]eregulation of certain common carriers" following enactment of the Airline Deregulation Act of 1978, 92 Stat. 1705, "returns us to the common law"). Fujitsu's mere recitation of our non-retroactivity holding in *Chubb*, therefore, is not sufficient to refute FedEx's abatement argument.

However, FedEx's enticing argument suffers a crucial flaw: the issue of whether the provisions of a treaty have been abated or extinguished following the entry into force of a subsequent treaty is governed by neither the common law doctrine of abatement nor the general savings statute codified at 1 U.S.C. § 109. Rather, when resolving that question, we apply the rules of customary international law enunciated in the Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U.N.T.S. 331 ("Vienna Convention"). As we did in *Chubb*, we rely upon the Vienna Convention here "as an authoritative guide to the customary international law of treaties." *Chubb*, 214 F.3d at 309. Because the United States "recognizes the Vienna Convention as a codification of customary international law," it "considers the Vienna Convention 'in dealing with day-to-day treaty problems'" and acknowledges the Vienna Convention as, in large part, "the authoritative guide to current treaty law and practice.'" *Id.* at 308; *see* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES, pt. III, intro. note, at 144–45 (discussing Vienna Convention's codification of the customary international law governing international agreements and the acceptance of the Convention by the United States).

■ The ongoing effect of treaties under customary international law is not governed by the same rule governing the ongoing effect of statutes under the common law. Rather, customary international law, as recited by the Vienna Convention in some detail, supplies its own distinct set of rules concerning the amendment, modification, suspension, and termination of international agreements. *See* Vienna Convention arts. 39–41, 54–64. Unlike the common law relating to statutes, customary international law contains no baseline presumption that the provisions of a new agreement automatically abate and extinguish any prior treaty relating to the same subject matter. To the contrary, customary international law governing the effect of treaties furnishes almost the opposite baseline norm, *pacta sunt servanda*, which provides that a treaty in force is "binding upon the parties to it and must be performed by them in good faith" unless the treaty has been affirmatively terminated or suspended. Vienna Convention art. 26; *see* 1 RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 321 & cmt. a, at 190 (stating that the doctrine of *pacta sunt servanda*, though subject to international law rules concerning the validity and termination of agreements, "lies at the core of the law of international agreements and is perhaps the most important principle of international law"); *see also* Vienna Convention art. 27 ("A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty.").

This contrary presumption is particularly relevant with respect to multilateral treaties such as the Warsaw Convention, because such treaties frequently are modified—but not thereby terminated—by

amend[ing] agreements binding only those parties that were willing to accept the amendment while leaving the original or earlier amended agreement still in force to govern relations between the other parties, as well as between the other parties and the amending group. As a result, it has become fairly common for several versions of a multilateral

treaty to exist simultaneously, with different sets of provisions operating between various groups of states.

Maria Frankowska, *The Vienna Convention on the Law of Treaties Before United States Courts*, 28 Va. J. Int'l L. 281, 361–62 (1988).

 Under Article 59 of the Vienna Convention, an international agreement is deemed to have been "terminated" by conclusion of a later treaty only if all of the parties to the first agreement conclude a later agreement relating to the same subject matter *and* either

(a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; *or*

(b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.

Vienna Convention art. 59. In this case, while the Hague Protocol and Original Warsaw Convention clearly relate to the same subject matter, it is equally clear that the Original Warsaw Convention was not terminated by enactment of the Hague Protocol. Not only were all of the parties to the Original Warsaw Convention not parties to the Hague Protocol, but we have already concluded that (a) the parties to the Hague Protocol did not intend for that treaty to govern conduct taking place before entry into force of that agreement, *see Chubb*, 214 F.3d at 307 n. 4; 1 Restatement (Third) of Foreign Relations Law of the United States § 322(1); and (b) the two treaties are not "so far incompatible" that they "are not capable of being applied at the same time." Vienna Convention art. 59(1)(b). To the fullest extent possible, treaty language is to be interpreted so as to avoid inconsistency. *See* 1 Restatement (Third) of Foreign Relations Law of the United States § 332 cmt. f, at 211. By giving effect to the Original Warsaw Convention for conduct taking place before entry into force of the Hague Protocol and effect to the Hague Protocol for conduct taking place after entry into force of that agreement, we easily avoid any possible inconsistency between the two agreements.

It is therefore not necessary for us to consider whether FedEx still would be able to invoke the liability limitation under the terms of the Amended Warsaw Convention, for notwithstanding the entry into force of the Hague Protocol in March 1999, we retain the authority to enforce the terms of the Original Warsaw Convention for conduct taking place prior to that date. We do, however, note our view that FedEx would not prevail even under the terms of the Amended Warsaw Convention. Upon its acceptance of the goods for shipment in Austin, FedEx permitted those goods to be loaded onto the aircraft for shipment without a new air waybill, apparently in violation of the requirements of even the amended version of Article 9. It was only upon arrival of the goods for shipment in Memphis that a new air waybill was generated for the return shipment to Narita.

Accordingly, we find that the entry into effect of the Hague Protocol during the pendency of this case did not preclude the application of the Original Warsaw Convention to the facts at issue here.

## C. Damages

With regard to provable damages, FedEx argues that Fujitsu produced no evidence showing that the wafers, which had been sealed inside impermeable aluminum bags, had been damaged in any way. It further contends that the trial court incorrectly determined the market value of the wafers to be the equivalent of the invoice price, when the testimony established that there was no real market for the wafers.

Finally, FedEx challenges the court's findings on the mitigation of damages by Fujitsu.

Fed R. Civ. P. 52(a) states that a trial court's findings of fact shall not be set aside unless they are clearly erroneous, and the appellate court must give due regard to the trial judge's opportunity to observe the witnesses as to their credibility.

▮ While FedEx is correct that the record contains no evidence that the wafers themselves were damaged, there was sufficient evidence adduced to support a finding by the court that the shipment was a total loss because the residue on the outer packaging made it impossible to access the wafers. According to the testimony, the bags containing the wafers could only be opened in a specially designed and maintained "clean room" so as to prevent dust contamination. However, because the bags themselves were coated with the oily residue, they could not be brought into a clean room for inspection, as the residue itself would contaminate the clean room. Consequently, the trial court found that even if the wafers were undamaged, Fujitsu was unable to extract them from the bags in an operable condition. This Court can discern no difference between damage rendering the wafers inoperable and damage that prevents otherwise operable wafers from being used or salvaged.

▮ While there was competing testimony on the issue of whether cleaning the residue from the bags in order to permit inspection and salvage of the wafers inside was economically reasonable, the trial court resolved this conflict by expressly choosing to credit the testimony of Fujitsu's expert. Specifically, the trial court held that "on issues of credibility and the importance of his testimony, I believe that Mr. Abend's [Fujitsu's expert] testimony is the more credible [than Mr. Chevrier, Fe-

dEx's expert] and it should be accepted." Credibility determinations are the province of the trial judge, and should not be overruled on appeal unless clearly erroneous. *Tenenbaum v. Williams,* 193 F.3d 581, 606 (2d Cir.1999); *Donato v. Plainview–Old Bethpage Cent. Sch. Dist.,* 96 F.3d 623, 634 (2d Cir.1996). This factual determination by the trial court will stand.

▮ In addition, with regard to mitigation, the trial court's factual finding that efforts to salvage the wafers would have been prohibitively expensive also suffices to reject FedEx's argument that Fujitsu failed to mitigate its damages.

▮ Finally, the appropriate measure of damages to cargo is the difference between the market value of the shipment at its destination and the value of the shipment as damaged. *Gulf, C. & S.F. Ry. Co. v. Texas Packing Co.,* 244 U.S. 31, 37, 37 S.Ct. 487, 61 L.Ed. 970 (1917); *Seguros Banvenez, S.A. v. S/S Oliver Drescher,* 761 F.2d 855, 860–61 (2d Cir.1985). Here, the trial court found that the market value of the wafers was $726,400, and the value of the damaged shipment was zero. While FedEx argues that the wafers, once rejected by Ross, had no value to any other potential buyer because they had been custom-made for Ross, this Court agrees with the trial court's calculation of damages. The record reflects that Ross placed an order for a similar shipment of wafers after the events at issue here. Accordingly, the trial court's assessment of damages is affirmed.

### D. Spoliation

FedEx sought a sanction against Fujitsu for spoliation based on the destruction of the wafers in July 1996. The record reveals that Fujitsu informed FedEx of the damage to the container immediately upon its arrival in Japan on June 24, 1996. Ac-

cording to the parties, on an undetermined date in July, after receiving instructions from its insurance company, Fujitsu destroyed the container and wafers. FedEx admits that it never contacted Fujitsu to seek an opportunity to inspect the container or otherwise request that the container or wafers should be retained.

■■■■ The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998). Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence. *See id.* at 127. The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, *see West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999), and is assessed on a case-by-case basis. *See United States v. Grammatikos*, 633 F.2d 1013, 1019–20 (2d Cir.1980). We have recently observed that "[our] case-by-case approach to the failure to produce relevant evidence seems to be working." *Reilly v. Natwest Mkts. Group, Inc.*, 181 F.3d 253, 267 (2d Cir.1999).

■■■■ In this case, the trial court found that FedEx had failed to demonstrate that Fujitsu's action was an intentional attempt to destroy evidence. In *Thiele v. Oddy's Auto and Marine, Inc.*, 906 F.Supp. 158, 160 (W.D.N.Y.1995), the court sanctioned the plaintiff for destroying an allegedly defective boat before the third-party defendant could inspect it, but denied a spoliation sanction requested by the main defendant who had been given the opportunity to inspect the boat prior to its destruction. *See also Indemnity Ins. Co. of N. Am. v. Liebert Corp.*, 96 Civ. 6675(DC), 1998 WL 363834 (S.D.N.Y. June 29, 1998) (denying spoliation sanction where defendant had an opportunity to inspect evidence prior to its destruction). It is undisputed that FedEx did not request to inspect the damaged shipping container after Fujitsu notified it of the damage, nor at any time other than prior to it making the summary judgment motion in August 1999. Accordingly, the trial court did not abuse its discretion in finding that, under the particular facts of this case, no sanction for spoliation was required.

### CONCLUSION

We hold that (1) because the return shipment from Austin to Narita constituted a new shipment that was constructively accepted by FedEx without the tender of a valid waybill, FedEx is not entitled to avail itself of the limitation of liability contained in the Original Warsaw Convention; (2) the entry into effect of the Hague Protocol does not abate the effect of the Original Warsaw Convention on events occurring prior to March 4, 1999; (3) the trial court was not clearly erroneous in finding that Fujitsu suffered damages in the amount of $726,400; and (4) the trial court did not abuse its discretion in refusing to sanction Fujitsu for spoliation.

AFFIRMED.