09-4407-cv
DeFabio v. East Hampton Union Free School District

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: July 13, 2010                              Decided: October 13, 2010)

Docket No. 09-4407-cv

------------------------------------------------------------------------x

DANIEL DEFABIO, PATRICIA DEFABIO,

*Plaintiffs-Appellants*,

MICHAEL RUSINSKY,

*Plaintiff,*

-v.-

EAST HAMPTON UNION FREE SCHOOL DISTRICT, SCOTT FARINA,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS PRINCIPAL
OF EAST HAMPTON HIGH SCHOOL, RAYMOND GUALTIERI,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS SUPERINTENDENT
OF SCHOOLS OF EAST HAMPTON UNION FREE SCHOOL DISTRICT,
WENDY HALL, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS
MEMBER OF THE BOARD OF EDUCATION OF THE EAST HAMPTON
UNION FREE SCHOOL DISTRICT, STEPHEN TALMAGE, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF
EDUCATION OF THE EAST HAMPTON UNION FREE SCHOOL DISTRICT,
LAURA ANKER GROSSMAN, INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY AS A MEMBER OF THE BOARD OF EDUCATION OF THE
EAST HAMPTON UNION FREE SCHOOL DISTRICT, SHARON BACON,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS A MEMBER OF
THE BOARD OF EDUCATION OF THE EAST HAMPTON UNION FREE
SCHOOL DISTRICT, THERESA K. QUIGLEY, J.D., INDIVIDUALLY AND
IN HER OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF
EDUCATION OF THE EAST HAMPTON UNION FREE SCHOOL DISTRICT,
JOHN RYAN SR., INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE BOARD OF EDUCATION OF THE EAST HAMPTON UNION
FREE SCHOOL DISTRICT, MICHAEL TRACEY, INDIVIDUALLY AND IN HIS

OFFICIAL CAPACITY AS A MEMBER OF THE BOARD OF EDUCATION OF
THE EAST HAMPTON UNION FREE SCHOOL DISTRICT,

*Defendants-Appellees.*
-----------------------------------------------------------------------x

PRESENT:    PIERRE N. LEVAL,
               BARRINGTON D. PARKER,
               PETER W. HALL,

*Circuit Judges.*

Plaintiffs-Appellants Daniel and Patricia DeFabio appeal from an order of the United States District Court for the Eastern District of New York (Bianco, *J.*) granting defendants' motion for summary judgment. We hold that in a case involving a student's assertion of a First Amendment right to return to school and make a statement disavowing a racial slur attributed to him, the school officials alleged to have violated the student's rights were entitled to qualified immunity from such claims where the record demonstrates a significant probability that the school would be disrupted and the student assaulted were he permitted to return to school and deliver his message. AFFIRMED.

> RAYMOND G. KUNTZ, (Leah L. Murphy, *on the brief*), Kuntz, Spagnuolo & Murphy, P.C., Bedford Village, New York, appearing for Plaintiffs-Appellants.
>
> DIANE K. FARRELL (Jeltje deJong, David H. Arntsen, *on the brief*), Devitt Spellman Barrett, LLP, Smithtown, New York, appearing for Defendants-Appellees.

PER CURIAM:

Plaintiffs Daniel and Patricia DeFabio appeal from a September 30, 2009, judgment of the United States District Court for the Eastern District of New York (Bianco, *J.*), granting defendants' motion for summary judgment on plaintiffs' claims brought pursuant to 42 U.S.C. § 1983 alleging violations of Daniel's rights to freedom of speech, freedom of association, due process and equal protection under the First and Fourteenth Amendments, as well as related state

law claims. We hold that in a case involving a student's assertion of a First Amendment right to return to school and make a statement disavowing a racial slur attributed to him, the school officials alleged to have violated the student's rights were entitled to qualified immunity from such claims where the record demonstrates a significant probability that the student would be assaulted were he permitted to return to school and deliver his message.

## I. The Facts

Drawing all reasonable factual inferences in the light most favorable to the Appellants, as we must when reviewing a district court's grant of summary judgment, *see, e.g., D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), the events that follow took place in the spring and summer of 2004 in East Hampton, New York. On Friday, April 24, 2004, Andres Felipe Osorio-Diez, a Hispanic student at East Hampton High School, was killed in a motorcycle accident. The following Monday, April 26, 2004, was a day of mourning in the school. Remorse among Osorio-Diez's friends turned to outrage when a rumor spread through the school that Daniel DeFabio, a tenth grader at the school, had commented to a friend in reference to Osorio-Diez's ethnic background: "one down, forty thousand to go." Students were openly hostile toward Daniel throughout the day, some threatening to kill him and bomb his house. In the cafeteria during eighth period a group of four or five Hispanic students confronted Daniel and yelled that he was a racist. One of the students threw something at him. Ralph Naglieri, a school psychiatrist, physically removed Daniel from the cafeteria after hearing from a distraught student a report of the comment attributed to Daniel and the resulting commotion. Daniel did not resist being removed from the lunch room.

3

Naglieri took Daniel to the nurse's office. Soon thereafter a crowd of agitated students assembled outside, yelling at Daniel and threatening to kill him. Daniel was uncomfortable and afraid. The school principal, Scott Farina, arrived in the nurse's office, asked Daniel what had transpired that day, and called the police to assist in escorting Daniel out of school. A police officer arrived in the nurse's office, Daniel put on his backpack, and, flanked by the police officer and one school administrator, Daniel ran out of the school. As Daniel departed, students yelled at him in Spanish. Farina informed Daniel's mother, Patricia DeFabio, that Daniel was being sent home for his own protection and that Daniel should stay home for a few days until the atmosphere in the school had calmed down.

The following day Daniel's mother asked Principal Farina to read over the school's public address system a letter from Daniel declaring his innocence. She requested, in the alternative, that the school permit Daniel to read the statement during a school assembly or that the school distribute the statement to the students in written form. Principal Farina denied all of these requests, citing the risk that any statement could further aggravate tensions in the school. In the days following April 26, Daniel received a number of threatening phone calls at his house as well as a threatening message in Spanish on his cell phone. In light of threats heard by Farina that students were planning to burn Daniel's house, police were assigned to patrol outside of the DeFabio household for the remainder of the week.

On April 29, 2004, Patricia DeFabio and her partner, Michael Rusinsky ("Daniel's parents"), met with Farina, assistant principal Michael Burns, and guidance counselor Caryn Lieber to discuss the events of the past days. Farina advised Daniel's parents that Daniel could not immediately return to school in light of concerns for his safety. Daniel's parents disagreed

4

and argued strenuously that the best course of action would be to allow Daniel to return to school to "address the rumor." Farina denied their request citing the need to preserve order and calm in the school. Daniel wanted in some way to return to school, but was also "pretty scared." Daniel's parents acknowledged during this meeting that they felt intimidated in their home.

The next morning, April 30, an attorney hired by Daniel's parents contacted the school to inquire when Daniel would be readmitted to school. That afternoon Daniel received a hand-delivered letter from Principal Farina informing him that he would be suspended for five days, that Daniel was entitled to an informal hearing and that he had twenty-four hours to inform Farina if he wanted a hearing. The letter also noted that, because of the seriousness of the infraction, a Superintendent's Meeting might be held, and that if so, Daniel would receive notice from the Superintendent's office.

A week later a Superintendent's Meeting was held. Daniel attended the meeting, venturing out of his house for the first time since the day of the incident. Two students testified against Daniel. Superintendent Raymond Gualtieri found that Daniel had made the comment alleged and suspended Daniel for the remainder of the 2003-2004 school year. Daniel received home tutoring for that time period.

Following the meeting, Principal Farina accompanied Daniel to a meeting with twelve student representatives of the Latin American community in East Hampton High School. At the meeting, Daniel told the students that he did not originate the offending statement but that he had merely repeated the comment to a friend, stating preliminarily that "you would not believe the terrible thing that I just heard someone say in the hallway." At this meeting with the twelve students, Daniel also distributed the written statement that he had earlier requested the school to

5

read or otherwise distribute.[1]  Most of the students told Daniel that they did not believe him. Their conclusion was informed in part by Daniel's failure to return to school following the incident—they found his absence and silence consistent with guilt.  Farina informed the students that he had not allowed Daniel back in school and had denied Daniel's request to distribute his statement.

On May 18, 2004, Daniel appealed Superintendent Gualtieri's adverse decision to the Board of Education, which upheld the decision.  Daniel further appealed to the New York Commissioner of Education.  The Commissioner of Education annulled Daniel's suspension and overturned the Superintendent's finding.  The incident was expunged from Daniel's record.  The Commissioner found that the record contained insufficient evidence that Daniel had been the originator of the offending comment.

During the summer of 2004, various individuals of Hispanic background threatened Daniel at the marina where he worked.  One of them attempted to get onto a boat where Daniel was working to fight him but was stopped by the first mate.  On two or three occasions while Daniel was riding in a car various individuals cursed at him and threatened his life.  Once while at a gas station a Hispanic individual confronted Daniel and told Daniel that he was lucky he "didn't [get] pop[ped]."  In August of 2004, Daniel and his family decided that for Daniel's

---

[1] The letter stated that Daniel heard a "horrible comment . . . in the hall way," and that "[i]n disbelief [he] repeated it to a friend adding 'I can't believe someone could say something that terrible.'"  The letter explained that when Daniel moved to East Hampton a number of years ago as an "up island urban kid" he felt himself an outsider and therefore he could identify with "kids coming from different countries because they too were considered different."  The letter also stated that Daniel knew and liked the recently deceased student, that he mourned his loss and how sorry he was "about the . . . misunderstanding about a comment I would never say." Daniel asserted that the message contained in his letter represented the substance of the message that he would have delivered to his classmates had he been permitted back into the school.

safety he would attend school in California the following year. Daniel never returned to East Hampton High School.

## II. Procedural History

In April 2007 Daniel and Patricia DeFabio filed a 42 U.S.C. § 1983 civil rights action against East Hampton Union Free School District (the "District"), and Principal Farina, Superintendent Gualtieri, and the members of the East Hampton Union Free School District Board of Education in their individual and official capacities (the "Individual Defendants"). The complaint alleged that the District and the Individual Defendants had violated Daniel's rights to freedom of speech and freedom of association under the First Amendment, and to due process and equal protection under the Fourteenth Amendment. Appellants also asserted claims under New York state law. Following discovery, the District and the Individual Defendants (the "Defendants") moved for summary judgment. The district court granted the Defendants' motion.

The district court addressed Daniel's First Amendment claims on the merits and concluded that they were unavailing in light of controlling Supreme Court and Second Circuit precedent. The court held in the alternative that even if Daniel had shown that his free speech rights were violated, the District could not be found liable because the plaintiffs had adduced no evidence of a "policy or custom" resulting in any putative violation. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978) (holding that municipalities may not be held liable under 42 U.S.C. § 1983 for the constitutional torts of employees under a theory of *respondeat superior,* but may be found liable when employees act pursuant to a "policy or custom" established by the municipality). The court also held the Individual Defendants were sheltered from liability by the doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding

7

that "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known"). Insofar as Daniel claimed that his rights to freedom of association, equal protection and due process were violated, the district court considered the merits of these claims and found them unpersuasive. Having determined that Daniel's federal claims were without merit, the court declined to exercise supplemental jurisdiction over Daniel's state law claims.

### III.    Daniel's Claims Against the District

To the extent Appellants maintain their claims under § 1983 asserting constitutional violations against the District on appeal, they have failed to address the district court's rationale that any alleged violation of Daniel's rights did not occur pursuant to a "policy or custom" established by the District. *Monell,* 436 U.S. at 694. We find the district court's reasoning on this point to be persuasive. Appellants have thus waived any appeal from the district court's decision dismissing the claims against the District on that basis. *See Norton v. Sam's Club,* 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Furthermore, nothing in the record suggests that the District has in place any policy or custom that would have subverted Daniel's constitutional rights.

### IV.    Daniel's Claims Against the Individual Defendants

#### a.    First Amendment Claims

In light of the record in this case, we hold that the Individual Defendants have qualified immunity with respect to Appellants' First Amendment claims. Qualified immunity is available

8

to the Individual Defendants with respect to the limitations on Daniel's speech and his removal from school "if either (1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). Assuming *arguendo* that Daniel had a "clearly established" right under the First Amendment to return to school following April 26, or to be permitted to address his classmates on school property regarding the events of that day, although we doubt that such a right existed under the circumstances presented here, it was "objectively reasonable for [the Individual Defendants] to believe that they [were] acting within constitutional and statutory bounds," *Wilkinson v. Russell*, 182 F.3d 89, 97 (2d Cir. 1999) (internal quotation marks and alterations omitted), in prohibiting Daniel's return to East Hampton High School in light of repeated and serious threats to Daniel's physical safety.

### i. Student Speech

The maxim that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969), is long-established and well-worn with limitations. Speech that can "reasonably be regarded as encouraging illegal drug use" may be restricted by school administrators. *Morse v. Frederick,* 551 U.S. 393, 397 (2007). Schools may impose sanctions upon students for vulgar and lewd speech that serves to "undermine the school's basic educational mission." *Bethel Sch. Dist. v. Fraser,* 478 U.S. 675, 685 (1986). Speech that could be perceived as affirmatively promoted by the school, as opposed to merely tolerated, may be further restricted so long as the school's limitation is "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch.*

9

*Dist. v. Kuhlmeier,* 484 U.S. 260, 273 (1988). Student speech that does not fall within any of the above exceptions remains governed by the standard announced in *Tinker*: it may be restricted if the speech will "materially and substantially disrupt the work and discipline of the school." *Tinker,* 393 U.S. at 513. To the extent that a school is in most instances a non-public forum, the school's limitations on student speech need only be "reasonable and viewpoint neutral." *Make the Rd. by Walking, Inc. v. Turner,* 378 F.3d 133, 143 (2d Cir. 2004).[2]

### ii. Daniel's Individual Speech

With respect to the statement that Daniel wished to make on his own, without the assistance of the school, it did not involve drugs, was not lewd or vulgar, and could not have been perceived to be school-sponsored. The rule announced in *Tinker*, therefore, delineates our review of the Individual Defendants' alleged violation of Daniel's First Amendment rights. Applying *Tinker,* the relevant inquiry is whether "the record . . . demonstrate[s] . . . facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Tinker,* 393 U.S. at 514.

---

[2] Appellants assert that a limited public forum was created in East Hampton High School in the form of an assembly held in the auditorium to mourn the loss of Osorio-Diez, during which students were permitted to discuss the comment attributed to Daniel. Assuming *arguendo* that the school did create a limited public forum, Appellants have made no showing that any person wishing to speak on behalf of Daniel during the assembly was prohibited from doing so. *See Husain v. Springer,* 494 F.3d 108, 127 (2d Cir. 2007) (explaining that "once a state institution opens a limited forum to speech on a particular topic, it may not act against a speaker in that forum on the basis of views they express on that topic"). Appellants have cited no authority to support their contention that the school, by allegedly creating a single-day limited public forum for the purposes of mourning Osorio-Diez, was thereby obligated to organize a separate and distinct assembly for the defense of Daniel. Thus, even assuming that a court would ultimately conclude that Daniel had such a right, it was reasonable for Appellants to believe that their actions did not violate any of Daniel's clearly established constitutional rights.

Appellants assert that there was nothing on the face of Daniel's message which could "lead to a determination that its dissemination would risk a material disruption at the school," and that the district court erred in focusing on "the atmosphere at school, not the speech being prohibited." Appellants' Br. at 37, 49. Appellants misread *Tinker*. The Court's focus in *Tinker* was not on the contours of the specific message the petitioners sought to convey by wearing black arm bands — the message itself was simple and self-evident: opposition to the war in Vietnam. *Tinker,* 393 U.S. at 504. The Court's focus was on the extent to which the speech would be accompanied by "disorder or disturbance on the part of the petitioners." *Id.* at 508-14. In contradistinction to the facts presented in *Tinker,* the Supreme Court cited *Blackwell v. Issaquena County Board of Education,* 363 F.2d 749 (5th Cir. 1966), where the Fifth Circuit upheld the enforcement of a similar ban because "the students wearing freedom buttons harassed students who did not wear them and created much disturbance." *Tinker,* 393 U.S. at 505 n.1. The Court explained that in order for a school to suppress student speech on the grounds of preventing material disruption in the school, administrators must have more than an "undifferentiated fear or apprehension of disturbance" and must be able to show that its action "was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 508, 509.

Appellants also cite *Governor Wentworth Regional School District v. Hendrickson,* 421 F. Supp. 2d 410 (D.N.H. 2006) in support of their argument that the district court was required to undergo an in-depth review of the context of Daniel's speech. The court in *Hendrickson* confronted a school's prohibition on students wearing an anti-Nazi patch and struggled with the question of "how (and where) to draw the line between a reasonable (and legally sufficient) fear

11

of disturbance, and one that is merely 'undifferentiated.'" *Hendrickson,* 421 F. Supp. 2d at 421. Here, however, we do not face any difficulty in line drawing. There is no question that Daniel's mere presence in the school, with or without his speech, would likely result in violence or the threat of violence and would therefore "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker,* 393 U.S. at 509; *see Guiles v. Marineau,* 461 F.3d 320, 326 (2d Cir. 2006) (explaining that while *Tinker* was not entirely clear as to what constitutes "substantial interference," violence or the threat of violence would undoubtedly qualify). The record shows, *inter alia,* that police were assigned to protect the DeFabio home, Daniel's parents felt intimidated in their home, Daniel received death threats, and he admitted he was scared to return to school. The fact that hostility towards Daniel continued throughout the summer of 2004 also speaks to the danger that Daniel faced were he to return to school in the months following the incident.

In *Doninger v. Niehoff,* 527 F.3d 41 (2d Cir. 2008), we explained that "'[s]chool officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place'" and that "[t]he question is not whether there has been actual disruption, but whether school officials 'might reasonably portend disruption' from the student expression at issue." *Id.* at 51 (quoting *Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007) (alteration in original) and *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981, 989 (9th Cir. 2001)). Here the school had already experienced "actual disruption," and in light of, *inter alia,* threats heard in school that students were planning to bomb Daniel's house, the Individual Defendants could also "reasonably portend disruption" were Daniel readmitted to East Hampton High School. *LaVine*, 257 F.3d at 989.

Under the circumstances, therefore, it was reasonable for the Individual Defendants "to forecast substantial disruption of or material interference with school activities," *Tinker,* 393 U.S. at 514, were Daniel permitted to return to school to speak with his classmates about his version of what transpired on April 26. Because "it was objectively reasonable [for the Individual Defendants] to believe that their acts did not violate [Daniel's] clearly established rights," they were entitled to qualified immunity with respect to Daniel's asserted right to return to school and communicate his explanation. *Young,* 160 F.3d at 903.

### iii. School Sponsored Speech

With respect to the school's refusal to deliver Daniel's message to the student body in his absence—either over the public address system, during an assembly or in written form—in each instance the district court found that the message could be perceived to bear the imprimatur of the school and was thus subject to the standard announced in *Hazelwood*. The court found in the alternative that the school's refusal to distribute Daniel's statement was also permissible under the more demanding *Tinker* standard "for the same reasons articulated above—namely, concerns about the disruption to the school that such speech could cause, including violence or other disruptions by angry and emotional students."

Even applying the more demanding *Tinker* standard, Appellants have failed to show it was unreasonable for the Individual Defendants to have refused to publish Daniel's statement to his classmates in school. "Here, given the circumstances surrounding the [DeFabio] dispute, [Daniel's proffered statement] posed a substantial risk that [East Hampton High School] administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate . . . anger or confusion over" the veracity and sincerity of Daniel's

statement, as well as ancillary questions concerning the extent to which the school endorsed the statement by assisting Daniel in its publication. *Doninger*, 527 F.3d at 51-52. For these reasons, the Individual Defendants are entitled to qualified immunity with respect to this aspect of Appellants' First Amendment claim.

## V. Appellants' Remaining Claims

### a. Procedural Due Process

To the extent Appellants challenge the District's failure to provide an informal conference pursuant to New York Education Law § 3214(3)(b)(1) where Daniel could challenge the allegations of the complaining witness in the presence of school authorities as well as the District's alleged failure to provide him notice of the charges against him and the opportunity to explain his account of the facts, *see Goss v. Lopez,* 419 U.S. 565, 581 (1975), these claims are not preserved for appellate review, as Appellants raised them for the first time in their reply brief. *See, e.g., Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief."). Upon review of the record, furthermore, we have identified no "unusual circumstances" such that "manifest injustice" would result from failing to consider these claims. *Frank v. United States,* 78 F.3d 815, 833 (2d Cir. 1996), *vacated on other grounds*, 521 U.S. 1114 (1997). To the contrary, the record provides abundant support for the district court's finding that "the undisputed procedures afforded [Appellants] in connection with the initial and long-term suspension satisfied Daniel's due process rights under the U.S. Constitution."[3] *DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F. Supp. 2d 461, 493-94

---

[3] To the extent Appellants assert that the school did not afford Daniel adequate process under New York state law, the district court did not err in determining that "the failure to comply with certain provisions under state education law (that are not required by the United States

14

(E.D.N.Y. 2009). Accordingly, we find no error in the district court's grant of summary judgment for the Defendants on Appellants' procedural due process claim.

### b. Substantive Due Process

(1)      Appellants argue that the process that Daniel received was a pretextual farce, masking the District's true intent to subvert Daniel's First Amendment rights. Appellants argue that the district court erred by not crediting, on summary judgment, Appellants' factual assertion that Daniel was expelled from school in an effort to prevent him from asserting his "constitutional right to attend school, associate with his peers and speak," Appellants' Br. at 30, in light of their showing that (i) Daniel was not disciplined immediately following the events of April 26, 2004, (ii) his parents made repeated requests that he be readmitted to the school, (iii) the length of his suspension was "excessive," (iv) he was only expelled after his attorney contacted the school regarding his readmission, and (v) the District failed to include in its code of conduct and form letter informing Daniel of his five-day suspension that he had a right to confront the complaining witness. When deciding a summary judgment motion in a civil case, all factual ambiguities must be resolved in the non-moving party's favor and the court may not weigh the evidence, but rather must only determine whether a genuine issue of fact exists for trial. *See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir. 2006).

---

Constitution) cannot give rise to a federal due process claim under section 1983." *DeFabio v. E. Hampton Union Free Sch. Dist.,* 658 F. Supp. 2d 461, 492 (E.D.N.Y. 2009); *see, e.g., Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir. 1985) ("Absent a violation of clearly established *constitutional* or *federal statutory rights* of which a reasonable person would have known, a school official cannot be held accountable for damages under § 1983." (internal citation and quotation marks omitted)).

In considering a motion for summary judgment, however, "the mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the moving party." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). "To defeat summary judgment . . . nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' . . . and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Jeffreys v. City of N.Y.,* 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Fujitsu Ltd. v. Fed. Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001)). "Such an issue is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants." *United States v. Potamkin Cadillac Corp.,* 689 F.2d 379, 381 (2d Cir. 1982) (internal citations omitted). *But see Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (explaining that summary judgment should be used sparingly when the defendant's state of mind is at issue "because of juries' special advantages over judges in this area").

Even assuming that part of the District's motivation for suspending Daniel might have been to maintain tranquility at the school, as opposed to disciplining Daniel (as the District alleges), there is no evidence from which a rational trier of fact could conclude that the school's intent was to prevent Daniel from communicating his message to his fellow classmates. The record demonstrates that the school's intent in suspending Daniel was either to discipline him, after the investigation conducted by the school showed him to be the originator of the incendiary racial slur, or to avoid the patent likelihood of violence if Daniel returned (confirmed by numerous threats he received and the fact that he did not leave his house for almost two weeks following the incident). While it is true that the school's action prevented Daniel from

16

communicating with the student body *in the particular manner he requested*, a jury could not reasonably find that the school's motivation in suspending Daniel was to prevent him from communicating his point of view. The school made no effort to prevent him from communicating with the student body in other fashions that were easily available to him. Accordingly, no rational trier of fact could conclude that the District's decision to expel him from school for the remainder of the school year was intended to suppress Daniel's constitutional rights rather than address legitimate education concerns.

(2) Appellants claimed below that Daniel's substantive due process rights under the Fourteenth Amendment were violated when Daniel was suspended for five days on April 30, 2004, and thereafter for the remainder of the school year. "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Wood v. Strickland*, 420 U.S. 308, 326 (1975). We will only find error implicating a student's substantive due process rights upon a showing that an administrator's decision to expel the student was "arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly,* 889 F.2d 435, 439 (2d Cir. 1989).

In light of the nature of the statement attributed to Daniel, the number and diverse nature of the students affected by the statement, related concerns regarding Daniel's safety, and the Appellants' failure to adduce reasonable evidence of bad faith, the court did not err in concluding that the District's decision to expel Daniel for the remainder of the school year was not arbitrary or irrational. *See id.* at 439 (noting that "review and revision of a school suspension on substantive due process grounds would only be available in a rare case where there was no

17

'rational relationship between the punishment and the offense'" (quoting *Brewer v. Austin Indep. Sch. Dist.,* 779 F.2d 260, 264 (5th Cir. 1985))).

### c. Freedom of Association

In re-asserting their freedom of association claim before this Court, Appellants argue that the district court "granted defendants summary judgment on [Appellants'] freedom of association claim for the same [invalid] reason as the [Appellants'] free speech claims." Appellants' Br. at 55. As Appellants have identified no error in the dismissal of either the free speech claim or the free association claim, we affirm the latter ruling for the reasons explained above.

### VI. Conclusion

Finding the remainder of the Appellants' arguments without merit, we affirm the judgment of the district court.