Gregson JOSEPH, Plaintiff–Appellant,

v.

Michael O. LEAVITT,* Secretary of Department of Health & Human Services, Defendant–Appellee.

Docket No. 05–3348–CV.

United States Court of Appeals, Second Circuit.

Argued: April 21, 2006.

Decided: Sept. 13, 2006.

---

* Secretary Michael O. Leavitt is automatically substituted for his predecessor, Donna E. Shalala, as defendant-appellee pursuant to Federal Rule of Appellate Procedure 43(c)(2).

Gregson Joseph, Bronx, NY, pro se.

Kevan Cleary, Assistant United States Attorney, Brooklyn, NY, (Rosslyn R. Mauskopf, United States Attorney; Steven Kim, Assistant United States Attorney, on the briefs), for Appellee.

Before WALKER, Chief Judge, JACOBS and WALLACE, Circuit Judges.**

J. CLIFFORD WALLACE, Circuit Judge.

On this appeal, Gregson Joseph seeks review of a memorandum and order of the United States District Court for the Eastern District of New York (David G. Trager, *Judge* ) granting summary judgment in favor of the defendant on Joseph's Title VII claim. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the judgment of the district court.

## BACKGROUND

Joseph, an African–American male, began working for the Food and Drug Administration (FDA) in Brooklyn, New York, as a Consumer Safety Officer (CSO) in September 1989. [DA 607] The primary role of CSOs is to maintain the safety of the nation's supplies of food, pharmaceutical drugs, blood, and medical devices. [DA 647] CSOs therefore conduct inspections of the manufacturers and suppliers of these products. [DA 647] Joseph performed his duties in a satisfactory manner and his annual reviews ranged from "above average" to "outstanding." [DA 647] Joseph remains employed as a CSO. [DA 657]

On March 14, 2002, the FDA received an anonymous telephone call alleging that Joseph had been using cocaine for the last three years and that he was using a government vehicle to purchase the drug. [DA 225]

On March 20, 2002, police were called to Joseph's residence. [DA 237] Upon their arrival, Julie Douglas, Joseph's girlfriend, reported that Joseph had beaten and stabbed her with a knife. [DA 237–38] Based upon her statement and visible injuries, the two officers arrested Joseph for assault. [DA 237–38, 239–40] Both of the arresting officers believed that Joseph was under the influence of some substance other than alcohol. [DA 237–38, 239–40] Douglas also told the officers that she had used crack cocaine with Joseph on several

** The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

occasions, and that he was a habitual user of the drug. [DA 240, 248]

Later that day, Douglas telephoned the FDA, and was identified as the March 14 caller. [DA 244] Douglas gave the FDA her name and said she was Joseph's live-in girlfriend. [DA 225] She repeated what she had told the police, asserting that the attack was a result of her having reported Joseph to the FDA. [DA 244]

Joseph was arraigned on felony assault charges on March 22. Shortly after these incidents, the FDA became aware that Joseph had previously been arrested for domestic violence in September 2001. [DA 168]

Joseph was placed on administrative leave, with pay, on March 22. Shortly thereafter the FDA began its investigation. On the advice of his attorney, Joseph refused to speak to the FDA investigators. [DA 228] The FDA suspended its investigation after Joseph refused to cooperate. Joseph, however, remained on paid administrative leave.

The Bronx County District Attorney dismissed the criminal charges against Joseph on September 25, 2002. [DA 260] Following the dismissal, the FDA resumed its investigation of the allegations against Joseph. Joseph testified at a deposition that he witnessed Douglas stab herself with a kitchen knife. [DA 210–11] He denied that he hit Douglas on the head, and said that her head injuries could also have been self-inflicted. [DA 213] After the FDA investigation was concluded, the FDA directed Joseph to return to work on March 3, 2003. [DA 539]

In addition to being placed on administrative leave, Joseph also complained about the FDA's failure to appoint him a Pharmaceutical Specialist, receiving fewer pharmaceutical inspection assignments than he desired, his removal as "Complaints Coordinator," temporary reassignments to other offices within the New York Division, and his being denied requested training on two occasions. The district court held that none of these constituted adverse employment actions.

Joseph also brought retaliation and slander claims, which the district court rejected. Joseph does not challenge the district court's decision rejecting those claims on appeal.

## DISCUSSION

### I.

### A.

We turn first, as we must, to the issue of our jurisdiction. Although neither party has suggested that we lack appellate jurisdiction, we have an independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*. *See Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 328 (2d Cir.2005).

Under 28 U.S.C. § 1291, we ordinarily review only final judgments of the district courts. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). In this case, the district court appears to have failed to enter judgment on a separate document, as required by Federal Rule of Civil Procedure 58(a)(1). Nevertheless, the judgment became final 150 days after the order granting summary judgment was entered on the docket. *See* Fed.R.Civ.P. 58(b)(2)(B). Joseph's notice of appeal, filed on May 20, 2005, was therefore timely. See Fed. R.App. P. 4(a)(2) ("A notice of appeal filed after the court announces a decision or order—but before entry of the judgment or order—is treated as filed on the date of and after the entry"). The "failure to set forth a judgment or order on a separate document when required by Federal Rule

of Civil Procedure 58(a)(1) does not affect the validity of an appeal from that judgment or order." *See id.* 4(a)(7)(B). We therefore have jurisdiction to entertain Joseph's appeal.

**B.**

We review an order granting summary judgment de novo. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). We set forth the applicable legal standard for Title VII actions in *James v. New York Racing Ass'n:*

> At the outset, a plaintiff can avoid dismissal by presenting the "minimal" prima facie case defined by the Supreme Court in *McDonnell Douglas.* This requires no evidence of discrimination. It is satisfied by a showing of membership in a protected class, qualification for the position, *an adverse employment action,* and preference for a person not of the protected class. By making out this "minimal" prima facie case, even without evidence of discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated, and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action.... On the other hand, once the employer articulates a non-discriminatory reason for its actions, the presumption completely drops out of the picture. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff. Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.

233 F.3d 149, 153–54 (2d Cir.2000) (emphasis added) (internal quotations, alteration, and citations omitted).

■ Central to this appeal is whether Joseph has suffered an "adverse employment action." "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000). "An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Terry,* 336 F.3d at 138 (internal quotations and citation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal quotations, alterations, and citation omitted).

**II.**

**A.**

■ Joseph first argues that he suffered an adverse employment action when he was placed on administrative leave with pay during the pendency of his criminal case and for approximately five months thereafter.

Four of our sister circuits have considered whether placement on administrative leave, with pay, during an investigation constitutes an adverse employment action. Each court held that it did not. *See Singletary v. Mo. Dep't of Corr.,* 423 F.3d 886, 889, 892 (8th Cir.2005) (eighty-nine day suspension pending investigation); *Peltier v. United States,* 388 F.3d 984, 986, 988 (6th Cir.2004) (administrative leave pending internal investigation and grand jury proceedings); *Von Gunten v. Maryland,*

243 F.3d 858, 869 (4th Cir.2001) (short administrative leave pending investigation of complaint); *Breaux v. City of Garland,* 205 F.3d 150, 154–55, 158 (5th Cir.2000) (administrative leave pending Internal Affairs investigations). None of these cases, as the one before us, also involved pending criminal charges.

These circuits have reasoned that the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances. *See, Von Gunten,* 243 F.3d at 869 (The "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures"). We agree that an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner. The application of the FDA's disciplinary policies to Joseph, without more, does not constitute adverse employment action.

We therefore hold that Joseph's placement on administrative leave pending the criminal charges against him did not constitute an adverse employment action. The terms and conditions of Joseph's employment did not include a right to expect that he would be allowed to continue his responsibilities while he was facing serious criminal charges. This is especially true given the important and sensitive nature of Joseph's job responsibilities.

Joseph contends that the FDA's actions were adverse because the FDA did not "give appellant the benefit of the doubt or, even more importantly, proceed with the assumption that appellant was innocent until proven guilty." [Gray 24] The presumption of innocence applies to criminal

trials, however, and is not a requirement that Title VII imposes on employers.

■ The continued administrative leave following the dismissal of the criminal charges is a closer question. We conclude that the reasoning of our sister circuits is persuasive and now join them by holding that administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action.

The FDA's apparent decision to suspend its own investigation during the pendency of the criminal charges does not change our analysis. Joseph's refusal to cooperate with FDA investigators, while perhaps sound legal strategy for one facing criminal prosecution, thwarted the ability of the FDA to resolve the allegations against Joseph swiftly. Given this refusal, the FDA's decision to suspend its investigation during the simultaneous criminal prosecution was reasonable. As Joseph was the direct cause of this delay, he cannot now complain of it. We therefore need not consider whether the criminal prosecution, by itself, constituted an adequate reason to suspend a parallel investigation.

The lengthy duration of the administrative leave following the dismissal of criminal charges (approximately five months) is more troubling. Joseph first appears to argue that the dismissal of the charges conclusively resolved the issue and that he should have been reinstated immediately. Essentially, Joseph argues that the dismissal of the charges acts as a form of collateral estoppel on the FDA.

We disagree. The government's burden in obtaining a criminal conviction (proof beyond a reasonable doubt) is much greater than an employer's burden in dismissing an employee or temporarily relieving him of his duties. Moreover, many actions that may not constitute crimes (such as the

allegations of misuse of an employer's vehicle in this case) may nonetheless qualify as sufficient cause to discharge an employee. Therefore, the FDA was not required to treat the dismissal of the criminal charges as conclusively resolving the allegations before it. We conclude that the FDA's decision not to reinstate Joseph immediately after dismissal of the criminal charges did not alter the terms and conditions of Joseph's employment, and thus did not constitute an adverse employment action.

Joseph next argues that the FDA unreasonably prolonged the investigation after the charges were dismissed, and that this constituted an adverse employment action. Given the serious nature of the multiple allegations facing Joseph, as well as his initial refusal to cooperate, we hold that the FDA's actions did not constitute an adverse employment action. The FDA reinstated Joseph within four months after he began to cooperate with investigators. The delay here is not so unreasonable as to constitute an adverse employment action.

We need not hold that suspensions during investigations will never rise to the level of an adverse employment action.[1] An exceptionally dilatory investigation might constitute a material change in the terms and conditions of employment. Here, the FDA reasonably suspended its own investigation pending the criminal prosecution and, following the dismissal of the charges, acted with reasonable diligence in conducting its investigation of the serious accusations. Therefore, the FDA

---

1. We do not understand the concurrence's statement that "[t]he implication of the majority's holding is thus that paid administrative leave can never be adverse." In the foregoing textual sentence, we expressly do not reach the question.

The concurrence also takes issue with our reasoning, stating that the "circumstances bear[ ] on whether the employment action is *justified* not whether it is *adverse*." Concur. op. at 95. As we have explained in our opinion, however, the "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances." *See infra* at 91. The relevant question is therefore whether the employer has simply applied reasonable disciplinary procedures to an employee or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment. Paid suspension during an investigation could thus potentially be adverse if the employer takes actions beyond an employee's normal exposure to disciplinary policies.

We are similarly puzzled by the hypothetical employed by the concurrence. According to the concurrence, our opinion would allow a school to place a teacher on paid administrative leave solely because of the teacher's race. The terms and conditions of employment do not include the possibility that an employee could be suspended purely because of his or her race. (Such a condition would plainly violate Title VII.) By contrast, the terms and conditions of employment *do* include an expectation that an employee is subject to reasonable disciplinary procedures. This is precisely what has occurred in this case.

While the concurrence takes issue with one of the Fourth Circuit's citations in *Von Gunten,* it is important to point out that *every* circuit to address this issue has reached the same conclusion. We are not sure whether the concurrence would take the position that they are all mistaken. The fact that *four* other circuits (and countless district courts) have addressed this issue also belies the concurrence's assertion that we have "decided a question that may rarely, if ever, again be squarely presented." Concur. op. at 96.

We cannot accept the concurrence's contention that our holding is unnecessary. It appears to us that the concurrence would leave the district courts without any guidance in resolving the issue of whether paid administrative leave is an adverse employment action. This would either force the district courts to engage in a highly fact intensive inquiry under the third step of *McDonnell Douglas,* or, more likely, cause the district courts simply to rely on the reasoning of our sister circuits to address the issue.

did not materially alter the terms and conditions of Joseph's employment, and Joseph did not suffer an adverse employment action by his placement on administrative leave.

## B.

Joseph also argues that numerous other actions taken by the FDA constituted adverse employment actions. The district court held that none constituted an adverse employment action.

■ Although the district court's reasoning appears sound, we believe it simpler to resolve this appeal under step three of the *McDonnell Douglas* analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Even assuming that Joseph suffered materially adverse actions, the FDA has provided legitimate, non-discriminatory reasons for its actions, and there is simply not enough evidence for a reasonable jury to conclude that Joseph was discriminated against on the basis of his race or gender. Indeed, Joseph's reply brief does not even respond to the FDA's argument that there is no evidence of discrimination.

Joseph has not pointed to any evidence of discriminatory animus directed personally at him. He only puts forth weak statistical evidence in support of his claim, such as that there has never been an African–American Pharmaceutical Specialist in the New York District, the position to which Joseph aspires, between 1989 and the present. However, the New York District has only one such specialist position. The position has been open and filled only once during Joseph's long tenure with the FDA, and this was at a time when Joseph was not eligible for the position. The record does not reveal whether any African–Americans sought promotion to that position. The selection of a non-African-

American on that occasion, especially without any indication that a qualified African American sought the position, is not sufficient evidence of discrimination to survive summary judgment.

Joseph has similarly asserted that there has never been an African–American Bio-Research Specialist in the New York Division between 1991 and the present. [Blue 3, A 622] As with the Pharmaceutical Specialist position, there is only one such position in the New York Division. There is no evidence in the record about how many times the position was open and filled during Joseph's tenure or if any eligible African Americans applied for the position.

Joseph's statistical evidence is therefore not sufficient to permit a reasonable jury to conclude that he has been discriminated against on the basis of his race. The sample size for this "statistical" evidence is extremely small and insufficiently detailed to draw any meaningful conclusions. At most, the record discloses that the FDA filled one specialist position with a non-African American during Joseph's tenure, and there is no indication that any African Americans actually sought that position. Additionally, Joseph has not pointed to any evidence that he was discriminated against on the basis of his gender. Summary judgment was therefore appropriate.

## C.

At oral argument, Joseph made additional arguments that were not raised before the district court or in any of his appellate briefs, such as that African Americans were systematically excluded from clinical trial inspections and that the FDA was allegedly testing Fenfluramine on minority young people in order to research their propensity for violence. These arguments are waived, however, as they were not raised in appellant's opening

brief and were not argued in the district court. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below"); *cf. Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir.1993) ("Arguments may not be made for the first time in a reply brief").

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

Judge JACOBS concurs in a separate opinion.

DENNIS JACOBS, Circuit Judge, concurring.

I concur in the result, but I would affirm the judgment on a different ground. The holding of the majority opinion—that administrative leave with pay during the pendency of criminal charges or an investigation does not, without more, constitute an adverse employment action, *ante,* at 91–93 is in my view unnecessary and unsound.

## A

There is an alternative ground for affirming the dismissal of the complaint. The Secretary of the Department of Health and Human Services explained that Gregson Joseph (i) was placed on paid administrative leave because of the pendency of criminal charges indicating serious misconduct and (ii) was kept on paid administrative leave pending an internal FDA investigation into that conduct. These constitute legitimate, non-discriminatory reasons—regardless of whether the placement or retention on paid administrative leave amounted to an adverse employment action. Because Joseph has utterly failed to demonstrate that the reasons were pretextual, the complaint was properly dismissed. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Mario v. P & C Food Mkts., Inc.,* 313 F.3d 758, 767 (2d Cir.2002). The majority opinion implicitly recognizes that this alternative ground of decision is available and sound. *See ante,* at 91–94.

The FDA had ample justification for placing Joseph on paid administrative leave and keeping him there for the five months following dismissal of the criminal charges. Joseph had been arrested twice for assaulting his live-in girlfriend; Joseph's girlfriend had also made serious allegations that he both used drugs and had misused government property; and the investigating officers and the FDA's Internal Affairs investigator concluded that Joseph's girlfriend was credible. As the majority observes, it was incumbent on the FDA, given the "important and sensitive nature of Joseph's job responsibilities," to suspend him upon learning of serious criminal charges and to conduct a full and thorough investigation before returning him to duty. *See id.* at 91. As the majority further recognizes, the FDA's investigation was prolonged by Joseph's refusal to cooperate with FDA investigators during the pendency of the criminal charges.

Joseph's refusal may be understandable; but it caused the FDA's justifiable suspension of the investigation until Joseph was prepared to cooperate. *See id.* at 92–94. Given the strength of the FDA's justifications for (i) placing Joseph on paid administrative leave and (ii) leaving him there pending his cooperation with the internal investigation, Joseph has not come close to proffering evidence sufficient to "reasonably support[ ] a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 154 (2d Cir.2000).

## B

I do not subscribe to the majority's holding that paid administrative leave pending a disciplinary investigation can never constitute an adverse employment action.[2] The question is not a simple one. "A plaintiff sustains an adverse employment action if he ... endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To be materially adverse, a change in working conditions must be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities[ ]' "; at the same time, an actionable change "might be indicated by ... significantly diminished material responsibilities' " or circumstances " 'unique to a particular situation.' " *Id.* (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)). Relief from job duties in anticipation of dismissal (with or without pay) would seem to be an adverse development; and a substantial reduction in duties and responsibilities can in itself be painful and humiliating for a productive person. *See Burlington Northern & Santa Fe Ry. v. White*, —— U.S. ——, 126 S.Ct. 2405, 2416, 165 L.Ed.2d 345 (June 22, 2006) ("[A]n 'act that would be immaterial in some situations is material in others.' " (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir.2005))); *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships ...."). The majority opinion makes plausible arguments; but there are plausible arguments on both sides, and I decline to decide such a difficult question unnecessarily and categorically.

The holding of the majority opinion is limited to "administrative leave with pay *during the pendency of an investigation.*" *Ante*, at 91 (emphasis added). The pendency of an investigation certainly matters; however, that circumstance bears on whether an employment action is *justified*, not whether it is *adverse*. The implication of the majority's holding is thus that paid administrative leave can never be adverse; but I wonder what we would do in a case in which a school administrator told a teacher: "The parents do not want their children taught by a person of mixed race, so you are on paid administrative leave until you can be transferred to a comparable position at a nearby school."

The majority reasons that the placement of Joseph on paid administrative leave pending criminal charges did not constitute an adverse employment action because "[t]he terms and conditions of Joseph's employment did not include a right to expect that he would be allowed to continue his responsibilities while he was facing serious criminal charges." *Ante*, at 91. The case support for this rule is inapt.[3] More fundamentally, the breadth or

---

**2.** Given this holding, it is unclear to me why the majority considers: (i) the procedures that the FDA employed in determining whether to place Joseph on paid administrative leave, *see ante*, at 91–92; (ii) the FDA's decision to continue that leave for approximately five months after dismissal of the criminal charges, *see id.* at 91–92; and (iii) whether the placement of an employee on paid administrative leave during an exceptionally dilatory investigation might constitute an adverse

employment action, *see id.* at 93. All these issues bear on whether an adverse employment action was taken for discriminatory reasons, not on whether the action constituted a material change in the conditions of employment.

**3.** In formulating this basis for its holding, the majority relies on the Fourth Circuit's reasoning in *Von Gunten v. Maryland*, 243 F.3d 858, 869 (4th Cir.2001) (holding that paid adminis-

consistency with which an employment policy is applied does not bear on whether that policy is materially adverse. Although the legitimate expectations created by an employment contract and the broad application of an employer's policies are certainly relevant matters in determining whether a plaintiff has established discrimination, the broad and consistent application of an employment policy has little to do with whether the policy in operation inflicts a materially adverse change in employment. Thus, termination is always a materially adverse change in employment, *see Terry v. Ashcroft,* 336 F.3d 128, 138 (2d Cir.2003); it is no less so because the employee served at will, or because the employer made known its policy of firing employees whose work is deemed unsatisfactory.

I am consoled that the majority opinion has decided a question that may rarely, if ever, again be squarely presented. When an employee is put on paid administrative leave pending an investigation for wrongdoing, the employer will virtually always have a ready, legitimate and non-discriminatory reason for doing so; few employers will, out of animus, inflict a paid vacation.

trative leave pending investigation does not constitute adverse employment action because "terms, conditions, or benefits of a person's employment do not typically, if ever, include general immunity from the application of basic employment policies or exemption from [an employer's] disciplinary procedures."); *see ante,* at 91. But *Von Gunten* (mis)cites this proposition to *McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 484 (7th Cir.1996), in which the Seventh Circuit held that the fact that an employment policy was of general applicability had relevance to whether the plaintiff had successfully carried her burden of establishing discrimination, *not* whether the employment action was adverse. *Id.* ("[E]ven if we agreed with [plaintiff] that the restriction on her break times adversely affected the conditions of her employment and that she had established a prima facie case of retaliation, it would still be apparent that she has failed to present any evidence tending to cast doubt on the testimony ... that the break policy applied to all employees.").