Iris **LAWSON**, Plaintiff,

v.

**AVIS BUDGET CAR RENTAL, LLC;
Trish Homernuk, individually,
Defendants.**

**15-cv-01510 (GBD)**

United States District Court,
S.D. New York.

Signed July 12, 2016

Jesse Curtis Rose, The Rose Law Group PLLC, New York, NY, for Plaintiff.

A. Michael Weber, Joshua Daniel Kiman, Littler Mendelson, P.C., New York, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge

Plaintiff Iris Lawson filed this lawsuit alleging that her former employer, Defendant Avis Budget Rental, LLC ("Avis"), and former supervisor, Defendant Trish Homenuk,[1] violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and the New York State Human Rights Law, New York State Executive Law § 296 *et seq.* ("NYSHRL") by discriminating and retaliating against her due to her disabilities.[2] (Complaint, (ECF No. 2.) at ¶¶ 1, 77-96.) Lawson also alleged that Defendants violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA") and New York State Labor Law, Articles 6 and 19 ("NYLL"), contending that after her attorney sent a letter to Avis complaining about alleged discrimination, her duties ceased being managerial, making her a non-exempt employee eligible for overtime pay, which she did not receive. (*Id.* at ¶¶ 2, 97-106.)

Defendants moved, pursuant to Federal Rule of Civil Procedure 56, for summary judgment to dismiss Lawson's Complaint in its entirety. (Motion for Summary Judgment, (ECF No. 30).) Defendants have established that there is no admissible evidence sufficient to allow a trier of fact to find that Defendants discriminated or retaliated against Lawson on the basis of her disabilities, or to find that Lawson was eligible for overtime pay. Defendants' motion for summary judgment is GRANTED. The Complaint is DISMISSED in its entirety.

## I. Background

On or about September 23, 2002, Lawson began working for Avis as a "Rental Sales Agent" at Avis's Manhattan locations. (Declaration of A. Michael Weber in Support of Defendants' Motion for Summary Judgment ("Weber Decl."), Exhibit 2, Certified Transcript of Videotaped/Virtual Deposition of Iris Lawson ("Lawson Dep. Tr."), (ECF No. 32-2), at 13:20-14:17.[3]) In or around 2010, after having received several promotions, Lawson was once again promoted, this time to "Senior Operations Manager." (*Id.* at 14:5-17:25; *see* Plaintiff's Response to Defendants' Rule 56.1 Statement and Plaintiffs Rule 56.1 Statement ("Rule 56.1 Statement"), (ECF No. 38), at 1 ¶1,[4]) About a year later, Lawson was transferred at her own request to Avis's Westchester Airport location. (Lawson Dep. Tr. at 18:2-16; *see* Rule 56.1 Statement at 1 ¶1.) At Westchester Airport, Lawson reported to the "Airport Manager." (*See* Rule 56.1 Statement at 1 ¶2; Complaint at ¶27.) Defendant Homenuk became the "Airport Manager" at Avis's Westchester Airport location about six months after Lawson began working there, and at that time became Lawson's direct supervisor. (Rule 56.1 Statement at 1 ¶2; Complaint at ¶28.)

---

**1.** Lawson's former supervisor's name is spelled "Homenuk," not "Homernuk." (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def. Br."), (ECF No. 31), at 6 n.1.)

**2.** The ADA and FMLA causes of action were brought against Avis, only. (Complaint at 12-13.)

**3.** Deposition transcript pincites are to the page numbers located on the upper right-hand portion of each transcript page, not to the ECF bates-stamped page number.

**4.** Because Defendants' Rule 56.1 Statement of Undisputed Facts is included within Lawson's Rule 56.1 Response, citations refer only to Lawson's Response.

In December 2012, Lawson became severely depressed and had panic attacks several times per week. (Rule 56.1 Statement at 3 ¶ 1.) As a result, Lawson took disability and FMLA leave from December 2012 until March 2013. (Rule 56.1 Statement at 1 ¶ 3.) According to her sworn deposition testimony, when Lawson returned from leave, she retained the same job title, (Lawson Dep. Tr. at 19:10-12, 103:10-13), salary, (*see id.* at 103:3-9 (failing to recall any change to her salary), and material responsibilities, (*id.* at 103:14-16; *id.* at 104:4-105:2 (testifying that she did not experience any changes to her job duties upon returning from FMLA leave); *id.* at 120:19-20 (testifying that she was not demoted)), as she had prior to taking leave. (*See also* Rule 56.1 Statement at 2 ¶¶ 4-5.)

However, Lawson returned to a different work environment. While away on leave, Lawson's subordinate employees discovered that her absence was due to mental health issues. (Lawson Dep. Tr. 80:20-84:20.) When Lawson returned to work, the subordinate employees informed her that they were aware that she was "severely depressed" and had "issues." (*Id.* at 84:3-4.) They also made comments which alluded to Lawson's disability, calling her "unstable," "cuckoo for Cocoa Puffs," and stating that they "hope[d] she [had taken] her meds." (Lawson Dep. Tr. at 82:16-19, 84:5.) [5]

Additionally, Lawson testified that when she returned from her leave, she felt like her relationship with Homenuk had changed. (Lawson Dep. Tr. at 110:20-111:13 ("Q. How were the dynamics different between you and [Homenuk]? A. Well, we had a different relationship from before 1 left out for disability and when I came back. Q. What was the difference? A . . . . . [T]here it was a distance there. There was, like, it was just uncomfortable. . . . I felt like because I took the time, our relationship changed."); *id.* at 106:2-12 ("[T]here was a lot of tension so I believe[d] [Homenuk] didn't like me anymore. Q. Did she ever say she didn't like you anymore. A. That's just the way that, you know, that's what I perceived to be her, our demeanor.").) Specifically, Lawson testified that after she returned from leave, she and Homenuk communicated less frequently overall, and more often via text message than in phone conversations or in person. (*Id.* at 111:18-21 ("There was no communication. It was always texting or tell [me] this. It was just very minimal communication between us.").) [6] As a result, Lawson

5. The parties dispute how frequently Lawson was personally subjected to such insults from subordinates. For instance, Defendants contend that Lawson testified at her deposition that she personally heard insults on only one occasion. (Def. Br. at 15; Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Reply"), (ECF No. 39), at 5; Lawson Dep. Tr. at 94:2-12 ("Q. Other than that one day that you were describing where [subordinate employees] were talking about your medical condition, did they ever talk about that at another subsequent [occasion] to that? A. Not that I heard of but other employees heard about it. Q. I understand that. Do you remember anybody talking about that other than that one day? A. Not that 1 recall.").) Lawson responds by arguing that she testified that she heard employees talking about her *medical condition* on a single occasion, but that employees levied *insults* related to her medical condition against her on a regular basis. (Transcript of Oral Argument, (ECF No. 44), at 35:1-36:10; *see also* Affirmation of Jesse C. Rose ("Rose Decl."), (ECF No. 37), Exhibit A, Affirmation of Iris Lawson ("Lawson Aff"), (ECF No. 37-1), at ¶ 15.)

6. Lawson never approached Homenuk regarding her impression that her relationship with Homenuk, or the manner in which they communicated, had changed. (*Id.* at 112:12-14 ("Q. Did you ever approach [Homenuk] and ask her why things had changed? A. I don't think I did.").)

testified that she felt uncomfortable at work and that she was no longer a "part of the team." (*Id.* at 91:7-9 ("[I]t was just really uncomfortable working environment after that."); *id.* at 92:14-16 ("I was not part of the team after [the other employees found out about my condition].").)

In or around January 2014, Lawson contacted an attorney regarding her situation at work. (*See* Rose Decl., Exhibit E, Attorney Claim Letter and Draft Complaint, (ECF No. 37-5).) On or about January 24, 2014, Lawson's attorney mailed a letter along with a draft complaint to Avis alleging discrimination and retaliation. (*See id.*)

After the letter was sent, Lawson felt even more uncomfortable at work, and believed that her relationship with Homenuk had further deteriorated. (Lawson Dep. Tr. at 90:14-16 (indicating that things got really hard after the letter was sent); *id.* at 90:17-24 (indicating that the lack of communication with Homenuk made Lawson "fe[el] [like she] was locked out of [her] job").) Lawson felt so uncomfortable around Homenuk that she began reporting to work at the front counter at the start of her shift, preferring to wait until Homenuk had left for the day to access the computer in the manager's office to perform her managerial paperwork. (*Id.* at 92:5-15 ("I would try to go to the counter .... [because of] me *feeling like* I had to wait until later on that night to get my work done ...." (Emphasis added)); *id.* at 116:12-18 ("Well, when I would come in, ... before I went out on disability, you know, I was kind of able to work in the office, and then when I came back ..., I was just, you

know, I would come in, go to the counter.").) [7] At the front counter, part of Lawson's responsibilities included monitoring subordinate employees. (Lawson Dep. Tr. at 117:18-118:8).) After Homenuk left the office at 3:00 PM, Lawson had five hours, or half of every ten-hour shift, to access the manager's office outside of Homenuk's presence, as she preferred. (*Id.* at 119:21-120:18 ("Q. What was [Homenuk's] shift? A. Mornings, six to three. Q. So yours was ... ten to when? A. Ten to eight. Q. From three to eight, that five-hour period of time, you had full access to the office? .... A. Yes, ... I had access [from] three to eight.").)

Lawson continued to work in this environment until June 24, 2014, when she emailed Homenuk a resignation letter which reads as follows:

> To: Avis Budget Group
>
> Attn: Trish Homenuk
>
> I would like to notify you that I am resigning from my position as Senior Operations Manager with Avis Budget Group. My last day of employment will be Wednesday July 9, 2014.
>
> I would like to thank Avis Budget Group for the opportunities that I have been given over the last 12 years.
>
> Sincerely,
>
> Iris Lawson

(Weber Decl., Exhibit 1, Email from Lawson to Homenuk and Resignation Letter ("Resignation Letter"), (ECF No. 32-1).) At her deposition, Lawson testified that she resigned her employment voluntarily

---

7. All employees in Lawson's position were expected to work at the front counter. (*See* Rule 56.1 Statement at 3 ¶ 4 ("Operations managers are expected to spend as much as eighty (80) percent of their day performing hourly, non-managerial tasks."); Rose Decl., Exhibit B, Excerpt of Transcript of Examination Before Trial of Tricia Leigh Homenuk ("Homenuk Dep. Tr."), (ECF No. 37-2), at 96:4-18 ("Q. How much time would you say is spent during the course of the day for an operations manager in a typical shift getting their hands dirty, stepping in and helping get things done? .... A. "[W]e are getting our hands dirty if I had to put a number maybe eighty percent of the time.").) Lawson worked no more than eighty percent of any shift at the front counter. (Lawson Aff. at ¶ 25.)

to start a child-care center. (Lawson Dep. Tr. at 29:2-4 ("Q. You resigned voluntarily from Avis, correct? A. Right."); *id.* at 79:25-80:6 ("Q. And you resigned Avis to start your childcare center, correct? A. Yes.").)

After receiving Lawson's resignation letter on or around July 3, 2014, a district manager at Avis, told Lawson that she did not need to come to work through July 9, the date Lawson had specified would be her last, but would still be paid up until that date. (Rule 56.1 Statement at 3 ¶¶ 9-10.)

## II. Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When determining whether there is a genuine issue of material fact, courts must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997). The moving party bears the initial burden of establishing that a material factual dispute does not exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■■■ Once the moving party carries this initial burden, it shifts: the nonmoving party must then cite admissible evidence showing that there is a genuine issue for trial related to each claim on which summary judgment is sought. *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed. R. Civ. P. 56(a), (c). Neither conclusory allegations, unsubstantiated speculation, nor the mere existence of a scintilla of evidence will allow the nonmoving party to avoid summary judgment. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct.

2505; *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir.2001). In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial," and summary judgment is appropriate. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation and internal quotation marks omitted).

## III. Discrimination and Retaliation Claims

■■■ "[I]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004). When analyzing whether it is appropriate to grant summary judgment in an action alleging discrimination and retaliation under the ADA, FMLA, and NYSHRL, courts apply the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Heyman v. Queens Vill. Comm., for Mental Health for Jam. Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir.1999) (applying framework to ADA discrimination claim); *Potenza v. City of New York*, 365 F.3d 165, 167–78 (2d Cir. 2004) (per curiam) (applying framework to FMLA retaliation claim); *Snowden v. Trs. of Columbia Univ.*, No. 12–cv–3095, 2014 WL 1274514, at *9 (S.D.N.Y. Mar. 26, 2014) (applying framework to NYSHRL claim), *aff'd* 612 Fed.Appx. 7 (2d Cir.2015). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination or retaliation. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. To make out a *prima facie* case, a plaintiff must demonstrate, *inter alia*, that she suffered an adverse employment action. *Heyman*, 198 F.3d at 72 (discrimination-claim context); *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 608 (2d Cir. 2006) (retaliation-claim context). "[A]n adverse employment action is one which is

more disruptive than a mere inconvenience or an alteration of job responsibilities." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir.2006) (citation and internal quotation marks omitted). "[T]ermination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation" are all examples of materially adverse changes. *Id.* (citation and internal quotation marks omitted).

■ There is no record evidence on which a rational finder of fact could come to the conclusion that Lawson suffered a materially adverse employment action due to her disability. Lawson was not terminated. (*See* Resignation Letter; Lawson Dep. Tr. at 79:25-80:3 (confirming that she voluntarily resigned from Avis); Weber Decl., Exhibit 4, Excerpt of Transcript of Examination Before Trial of Tricia Leigh Homenuk, (ECF No. 32-4), at 67:9-68:25 (testifying that Lawson resigned and that Avis told her she did not have to continue coming in but Avis would pay her up until the date Lawson specified would be her last).) Nor does she allege or put forth any evidence to suggest that she ever experienced a decrease in salary or a material loss of benefits. (*See* Lawson Dep. Tr. at 19:7-9.) Up until she resigned, Lawson retained the same job title that she held prior to taking disability and FMLA leave. (*Id.* at 19:10-12; Rule 56.1 Statement at 2 ¶ 4.) And upon returning from FMLA leave, Lawson did not experience a significant diminution in material responsibilities. (Lawson Dep. Tr. at 103:3-16 (testifying that when she returned from disability and FMLA leave, her position and title were

the same, and her job responsibilities were the same); *id.* at 104:4-105:2 (testifying that other than having to work some night shifts, about which she did not complain or object, she did not experience any changes to her job duties upon returning from FMLA leave); *id.* at 120:19-20 (testifying that she was not demoted).)

Instead, Lawson argues that after her attorney sent a letter to Avis complaining of alleged discrimination, she was "given longer hours, a lower position and Defendant Homenuk stopped communicating with her." [8] (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Opp. Br."), (ECF No. 36), at 17.) Specifically, Lawson alleges that she was "locked out" of the manager's office while Homenuk was present, which forced her to work at the front counter, leading to her having to stay at work later than she had prior to the mailing of the complaint letter to complete her managerial work. But Lawson's own testimony undermines her allegation that she was "locked out" of the manager's office or that she was "forced to work at the front counter."

■ During her deposition, Lawson did not identify a single action by Homenuk or any other Avis employee to demonstrate that she was repeatedly or deliberately locked out of the manager's office. When asked about this allegation, Lawson testified that she "felt" like she was being locked out. (Lawson Dep. Tr. at 116:6-9 ("Q. You [allege] in your complaint that [Homenuk] locked you out of your office, right? A. "Yes, that's the way I felt.").) Indeed, Lawson testified that she found that the manager's office door was locked on only a handful of occasions, and that on

---

**8.** Lawson's deposition testimony belies the assertion that Homenuk stopped communicating with her. (*See e.g., id.* at 112:18-21.) Although Lawson's testimony indicates that she and Homenuk communicated electronically

(as opposed to in person) more often after Lawson's attorney mailed the complaint letter, a "mere inconvenience" does not constitute an adverse employment action. *See Joseph*, 465 F.3d at 90.

those occasions the door might have been locked because Homenuk was on a phone call or needed privacy at the time Lawson had attempted to enter. (*Id.* at 118:21-119:14 ("Q. My question is, you say that [Homenuk] locked you out of your office, what are you referring to? A. Well, there would be sometimes I would come upstairs and the office door would be locked. I don't know if she seemed to be on a call or just sitting there and the door would be locked so I would just go downstairs.").) Lawson testified that she never attempted to re-access the office a few minutes after finding that the door happened to be locked. (*Id.* at 119:15-20 ("Q. When [you found the door was locked] did you then go back up and find that the door was opened? A. Um—let me see—I usually didn't go back up until after [Homenuk] was gone.").) Moreover, Lawson did not testify that she even knocked on the door when she found that it was locked, or ever brought the situation to Homenuk's attention. Indeed, the very fact that Lawson attempted to access the manager's office while Homenuk was present belies her allegation that she was affirmatively prohibited from accessing the office. Finally, it is worth noting that Lawson had access to the manager's office, at the very least, for five hours of every ten-hour shift. (*Id.* at 119:21-120:18 ("Q. From three to eight, that five-hour period of time, you had full access to the office? .... A. Yes, ... I had access [from] three to eight.").) Given that Lawson's testimony lacks any suggestion that she was ever told by the Defendants that she was prohibited from entering the office, only found it locked on a handful of occasions, and in fact always had access to it for at least half of her shift, a rational trier of fact could not conclude that Defendants discriminated or retaliated against Lawson by locking her out of the manager's office.[9]

Furthermore, Lawson did not testify that she was ever ordered or even asked by Homenuk or any other Avis employee to work at the front counter.[10] Lawson

---

**9.** Lawson submitted an affidavit after Defendants filed their summary judgment motion. In her affidavit, Lawson states that Homenuk "made it very clear that I could not enter the office while she was there. She effectively, and several times literally, locked me out of the office during my shifts." (Lawson Aff. at ¶ 23.) To the extent this statement contradicts her deposition testimony, this Court disregards it under the sham-issue-of-fact doctrine. "The 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir.2014) (alterations, citation and quotation marks omitted). "The purpose of the doctrine is clear: if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (alterations, citation and quotation marks omitted).

Additionally, to the extent the statements in Lawson's affidavit could be construed as not contradicting her earlier deposition testimony, the statements are still insufficient to create a genuine issue of material fact. Lawson provided no facts to demonstrate how Homenuk had made it "very clear" that Lawson was prohibited from entering the office. Nor did she provide any facts or explanation to support the allegation that Homenuk had "effectively" locked her out of the office. *See Fujitsu Ltd.*, 247 F.3d at 428 (conclusory allegations insufficient to create a genuine issue of material fact).

**10.** After Defendants submitted their motion for summary judgment, Lawson filed an additional affidavit signed by John Van Nostrand, another Avis employee. (Rose Decl., Exhibit D, Affidavit of John Van Nostrand ("Van Nostrand Aff."), (ECF No. 37-4)). Van Nostrand's statement in his affidavit that "[a]t one point Ms. Lawson was assigned to just work at the front desk like the hourly employees," (*id.* at ¶ 14), is unsubstantiated speculation. He offers no facts to explain how he obtained

testified that she felt uncomfortable around Homenuk after her attorney had sent the complaint letter, and as a result, decided to work at the front counter on her own volition. (Lawson Dep. Tr. at 106:2-12 ("[F]or that year there was a lot of tension so I believe [Homenuk] didn't like me anymore. Q. Did she ever say she didn't like you anymore. A. That's just the way that, you know, that's what I perceived to be her, our demeanor."); *id.* at 92:5-15 ("I would try to go to the counter .... [because of] me *feeling like* I had to wait until later on that night to get my work done ...." (Emphasis added)); *id.* at 116:12-18 ("Well, when I would come in, being that things before I went out on disability, you know, I was kind of able to work in the office, and then when I came back ..., I was just, you know, I would come in, go to the counter.").) Moreover, managers in Lawson's position were expected to work at the front counter on a regular basis, often up to 80% of each shift, based on business needs. (Rule 56.1 Statement at 3 ¶ 4 ("Operations managers are expected to spend as much as eighty (80) percent of their day performing hourly, non-managerial tasks."); Homenuk Dep. Tr. at 96:4-18 ("Q. How much time would you say is spent during the course of the day for an operations manager in a typical shift getting their hands dirty, stepping in and helping get things done? .... A. "[W]e are getting our hands dirty if I had to put a number maybe eighty percent of the time.").) Lawson worked no more than eighty percent of any shift at the front counter. (Lawson Aff. at ¶ 25.) Thus, the record evidence demonstrates that Lawson's work at the front counter comported with what was expected of anyone in her position. Accordingly, the allegedly in-creased amount of time that Lawson spent working at the front counter after her attorney sent the complaint letter cannot constitute an adverse employment action. *Cf. Joseph*, 465 F.3d at 90 (alteration of job responsibilities insufficient to constitute an adverse employment action).

Finally, in her opposition brief, Lawson argues that she was forced to resign her employment with Avis due to a combination of the comments made by her subordinates, the increased hours she had to work to complete her managerial responsibilities, and because she was assigned to work the majority of the day at the front counter. (Opp. Br. at 15.)

 A plaintiff alleging constructive discharge must show that the employer "intentionally create[d] a work atmosphere so intolerable that [the employee] is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir.2003) (holding that allegations of constructive discharge, 'viewed as a whole, [must be] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign"). Additionally, "when dealing with a claim for constructive discharge resulting from retaliation, actual retaliation is a necessary predicate." *Johnson v. Potter*, No. 04–cv–6634, 2009 WL 2180354 at *17 (W.D.N.Y. July 22, 2009) (collecting cases), *aff'd* 398 Fed.Appx. 644 (2d Cir.2010) (summary order).

Lawson testified that she voluntarily resigned to start a child-care center. (Lawson Dep. Tr. at 29:2-4 ("Q. You resigned voluntarily from Avis, correct? A. Right."); *id.* at 78:20-80:6 ("Q. And you had been working on a second career, weren't you? A. Yes. Q. What was that? A. I was trying

---

such knowledge. Moreover, Van Nostrand's affidavit suggests that Lawson was his manager, (*id.* at ¶ 5), and it is not apparent how a subordinate employee would be privy to management decisions made at least two levels above him. Van Nostrand's unsupported statement is insufficient to establish a genuine issue of material fact. *See Fujitsu Ltd.*, 247 F.3d at 428 (unsubstantiated speculation insufficient to defeat summary judgment).

to have a day-care center.... Q. And you resigned Avis to start your child-care center, correct? A. Yes.").) Combined with her resignation letter, which she sent to Homenuk and in which she thanked Avis for the opportunities it had afforded her over the past twelve years, this testimony undermines her allegation that she was forced to quit her job involuntarily. Additionally, as just discussed, there is insufficient record evidence for a trier of fact to conclude that Defendants retaliated in any way against Lawson, and therefore Lawson has failed to establish a constructive discharge for this reason, as well.

## IV. Disclosure of Confidential Information Claim

Lawson also alleged that Defendants violated the ADA by disclosing Lawson's medical condition to subordinate employees. The ADA requires, with limited exceptions not pertinent here, that "information obtained regarding the medical condition or history" of an employee be "treated as a confidential medical record ...." *See* 42 U.S.C. § 12112(d)(3)(B) (requiring confidentiality of information obtained pursuant to medical examination or inquiry ordered by employer as condition of employment); 42 U.S.C. § 12112(d)(4)(C) (applying confidentiality requirements to information obtained relating to an employee health program); *see also Mahran v. Benderson Dev. Co.*, No. 10–cv–715A, 2011 WL 1467368, at *5 (W.D.N.Y. Apr. 18, 2011) (interpreting § 12112(d) and related federal regulations and concluding that employers, when making "[a]ny job-related medical inquiries, such as for a leave application, must keep the medical information confidential"). Lawson argues that she authorized Defendants to use her medical form submissions to establish her entitlement to take leave under the ADA and FMLA only. She argues that the alleged disclosure of her medical condition by Avis managers to

subordinate employees breached her right to confidentiality.

Defendants argue that Lawson has failed to proffer admissible evidence that Defendants disclosed information concerning her alleged disability to Lawson's subordinate employees, and therefore are entitled to summary judgment on this claim as a matter of law. In Lawson's deposition testimony, she offered no admissible non-hearsay evidence that her employer made any specific disclosure. (Reply at 7-8.) Van Nostrand's affidavit, submitted in opposition to the summary judgment motion, states that he heard Homenuk and another Avis manager tell subordinate employees that Lawson had taken a leave of absence because she was "crazy." (Van Nostrand Aff. at ¶¶ 7-9.) Defendants argue, however, that Van Nostrand's affidavit should be disregarded under the "sham affidavit rule." [11] (Reply at 6 n.2.)

Van Nostrand was not previously deposed, and therefore his affidavit does not contradict any of his own prior testimony. Nor does his statement contradict anything in the record. Accordingly, this Court declines to exclude this portion of Van Nostrand's affidavit under the sham-issue-of-fact doctrine. Nevertheless, even if Van Nostrand's affidavit is given full consideration on the issue of whether Defendants described Lawson as "crazy," Defendants are still entitled to summary judgment.

"A technical violation of the ADA 'will not in and of itself give rise to damages liability.'" *Katz v. Adecco USA, Inc.*, 845 F.Supp.2d 539, 545 (S.D.N.Y.2012) (quoting *Giaccio v. City of New York*, 502 F.Supp.2d 380, 387 (S.D.N.Y.2007), *aff'd* 308 Fed.Appx. 470 (2d Cir.2009)). Rather, to succeed on a claim alleging a violation of § 12112(d), a plaintiff also must plead and

11. *See supra* note 9 (describing sham-issue-of-fact doctrine).

then prove an injury-in-fact—*i.e.*, actual damages—resulting from the disclosure of her confidential information.[12] *Giaccio*, 502 F.Supp.2d at 387 (collecting cases).[13]

██ Lawson alleged that some of her subordinates insulted her after her medical condition had been disclosed to them, which caused her to feel "humiliated, degraded, victimized, embarrassed, and emotionally distressed," which eventually resulted in "significant emotional and physical damage." (Complaint at ¶¶ 69-71.) However, the record is devoid of any evidence demonstrating the "significant emotional and physical damage" alleged, and such bare-boned allegations are insufficient to survive a motion for summary judgment. *Compare Giaccio*, 502 F.Supp.2d at 387 (holding that "bare allegations of mental/emotional distress, mental anguish, stress and inconvenience, unsupported by any evidence, are insufficient to establish the damages necessary to maintain Plaintiff's action under the ADA" (internal quotation marks omitted)), *with Katz*, 845 F.Supp.2d at 546 (concluding plaintiffs allegations that violation of § 12112(d) caused, *inter alia*, severe emotional distress, including in-

creased anxiety and depression—evidenced by plaintiff taking Valium multiple times per day and exacerbation of eczema and psoriasis requiring medical attention—could satisfy damages element). Accordingly, Defendants' motion for summary judgment dismissing Lawson's claim alleging a violation of 42 U.S.C. § 12112(d) is granted.

## V. Fair Labor Standards Act and New York Labor Law Claims

Finally, Lawson brings causes of action against Avis for alleged violations of the FLSA and NYLL.[14]

Section 7(a)(1) of the FLSA provides that, subject to certain exceptions, an employee who works more than forty hours per week must receive compensation for "employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). One exception is that the overtime-pay rule "shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The FLSA does not define

**12.** This Court notes that the Second Circuit has "raised the possibility that a violation of the confidentiality provision of the ADA is not actionable without demonstrating discrimination." *Allen v. Verizon Wireless*, No. 12–CV–482, 2013 WL 2467923, at *17 (D.Conn. Jun. 6, 2013) (citing *Giaccio v. City of New York*, 308 Fed.Appx. 470, 471 (2d Cir.2009)). Nevertheless, this Court is unaware of any court within this circuit that has imposed such a requirement, and at least one court has affirmatively declined to do so. *See id.* (determining suggestion in *Giaccio* was dicta and proceeding to consider whether plaintiff alleged facts to plausibly suggest defendant violated her confidentiality even though discrimination had not been demonstrated). Accordingly, this Court will consider Lawson's confidentiality claim even though it has already granted Defendants' motion for summary

judgment with respect to the discrimination causes of action.

**13.** *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 519 (3d Cir.2001) (requiring "injury-in-fact"); *Cossette v. Minn. Power & Light*, 188 F.3d 964, 971 (8th Cir.1999) (requiring "tangible injury"); *Armstrong v. Turner Indus.*, 141 F.3d 554, 562–63 (5th Cir.1998) (requiring "cognizable injury").

**14.** Neither the Complaint nor Lawson's opposition brief specifies the statutory sections Lawson alleges Avis has violated; nor do any materials specify the statutory sections under which she seeks remedies. This Court assumes the statutory sections relevant to this action are 29 U.S.C. §§ 207(a)(1), and 216(b)(1), and the analogous sections of the New York Labor Law, which are N.Y. Labor L. §§ 2, 651 and 663(1).

"bona fide executive, administrative, or professional" employment, and instead directs the Secretary of Labor to "define [ ] and delimit[ ]" those terms "from time to time by regulations." *Id.*

*Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 558–59 (2d Cir.2012) (alterations in original).

The Department's regulations defining the terms of the FLSA's executive exemption provide that "[t]he term 'employee employed in a bona fide executive capacity' ... shall mean any employee":

(1) Compensated on a salary basis at a rate of not less than $455 per week ..., exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees;

(4) Who has the authority to hire and fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 CFR§ 541.100(a).

*Id.* at 559–60 (alterations in original).

■■■■■ "The exemption question under the FLSA is a mixed question of law and fact." *Id.* at 558 (citation and internal quotation marks omitted). "The question of how the employees spent their working time is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." [15,16] *Id.* (alterations and citation omitted).

■■■ Lawson concedes that prior to late January 2014, when her attorney sent the complaint letter, she was employed as a manager in a "bona fide executive, administrative, or professional capacity," and therefore not entitled to overtime compensation. (*See* Opp. Br. at 18.) However, she alleges that she became a non-exempt employee when Homenuk allegedly "refused to allow Plaintiff LAWSON to perform her job as a manager by locking her out of the office," began communicating with her via text message rather than in in-person meetings, and required her to work "the entire day at the front desk performing work typically performed by hourly workers." (Complaint at ¶¶ 55-57.) She therefore argues that she is entitled to overtime compensation for certain hours worked from the end of January 2014 until her last day of employment.

15. "Like the FLSA, the NYLL mandates overtime pay and applies the same exemptions as the FLSA." *Id.* at 556 n. 1 (citation and internal quotation marks omitted). This Court therefore discusses only the FLSA claim, and does not engage in a separate analysis of Lawson's NYLL claim.

16. Although Defendants did not raise the exemption affirmative defense in their answer to Lawson's Complaint, (*see* Answer, (ECF No. 9)), the Second Circuit has held that a "district court may consider the merits of an affirmative defense ... raised for the first time at the summary judgment stage, so long as the plaintiff has had an opportunity to respond." *See Astor Holdings, Inc. v. Roski*, 325 F.Supp.2d 251, 260–61 (S.D.N.Y.2003) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 330–31 (2d Cir.2003)). Defendants raised this affirmative defense in their initial brief supporting their motion for summary judgment. (*See* Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, (ECF No. 31), at 18-19.) Lawson had an opportunity to respond, and, in fact, did so. (Opp. Br. at 18-19.) This Court will therefore consider the merits of this affirmative defense.

Lawson's title and salary remained the same even after her attorney sent the letter in late January. (*See* Lawson Dep. Tr. at 120:19-20 (testifying that she was never demoted and failing to testify that her salary was ever decreased).) She therefore challenges only the second requisite the Department of Labor has set forth to establish an employee's exempt status, arguing that management ceased being her "primary duty" after Avis received her attorney's letter. (*See* Opp. Br. at 18 (arguing that Lawson was "effectively demoted" because she worked at the front desk for eight hours of her shift and then had to "stay late to do her managerial tasks").) This argument, however, is belied by Lawson's sworn deposition testimony.

Lawson testified that throughout the relevant time period she continued to supervise anywhere between ten and thirty salaried employees working in four or five different areas. (Lawson Dep. Tr. at 120:21-121:14.) Indeed, even while she was working at the front counter, Lawson testified that she monitored subordinate employees, and thus continued to serve in a managerial capacity while stationed at the front counter. (*Id.* at 117:18-118:8).) And although Lawson might not have been able to complete her managerial paperwork when she would have liked, she still was required to, and, in fact, did perform her managerial paperwork. (*Id.* at 120:2-13.) Thus, the record evidence fails to demonstrate that a rational trier of fact could conclude that Lawson's primary duties ceased being managerial to warrant converting her exempt status to nonexempt status.

## VI. Conclusion

Because Lawson's deposition testimony could not lead a rational trier of fact to find for her on any of her claims, there is no genuine issue for trial, and Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the above-captioned action.

SO ORDERED.